In re HILLSBOROUGH HOLDINGS CORPORATION, et al., Debtors.

HILLSBOROUGH HOLDINGS CORPORATION, et al., Plaintiffs,

v.

The CELOTEX CORPORATION, et al., Defendants.

Bankruptcy Nos. 89–9715–8P1 through 89–9746–8P1. Adv. No. 90–0003.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Aug. 25, 1992.

Don Stichter, and Michael J. Crames, New York City, for debtor.

Marsha Rydberg, Rydberg, Goldstein & Bolves, Tampa, Fla., and Elihu Inselbuch, Caplin & Drysdale, New York City, for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

ALEXANDER L. PASKAY, Chief Judge.

THIS IS an adversary proceeding commenced in these yet-to-be-confirmed Chapter 11 cases of Hillsborough Holdings Corporation (HHC), now known as Walter Industries, Inc. (Walter Industries), and its 31 wholly-owned subsidiaries (collectively referred to as the Debtors). In this connection, it should be noted that none of the Chapter 11 cases have been substantially consolidated, although procedurally the Debtors have been treated as a group as the matter involved impacts the interests of all the debtors.

The Debtors in their Complaint named as defendants Celotex Corporation (Celotex), Jim Walter Corporation (JWC), and hundreds of individuals (collectively referred to as Asbestos Claimants) who claim to have suffered personal injuries as the result of exposure to asbestos products manufactured and distributed by Celotex. Celotex was formerly a wholly-owned subsidiary of JWC but did not become part of the group which emerged after the leveraged buy-out (LBO) which ultimately produced HHC, now known as Walter Industries, the primary Debtor in this Chapter 11 case and the lead Plaintiff in this adversary proceeding.

In Count I of the Complaint, the Debtors seek a declaration by this Court that the corporate veil between Celotex and JWC cannot be pierced. In Count II of the Complaint, the Debtors seek a declaration that the LBO, a result of which all subsidiaries of JWC, with the exception of Celotex, have been acquired through intermediaries by HHC, now known as Walter Industries, was not a fraudulent transfer. In Count III, the Debtors seek a declaration by this Court that under applicable law, they are not the successors in interest (sic) to the asbestos-related personal injury claims asserted against JWC or Celotex. In Count IV, the Debtors seek a declaration by this Court that under applicable law, they are not liable for the asbestos-related liabilities of either JWC or Celotex.

The immediate matter under consideration is a Motion For Partial Summary Judgment filed by the Debtors. It is the contention of the Debtors that there are no genuine issues of material fact and they are entitled to the relief they seek in Count I of the Complaint, i.e., a declaration that the corporate veil between Celotex and JWC cannot be pierced as a matter of law. The Motion does not involve the second prong of their attack on the LBO based on the theory of fraudulent transfer.

In order to place the Motion in the proper context and also in the proper procedural posture, a recap of the undisputed facts as

they appear from the record should be helpful.

## PRE–BANKRUPTCY LITIGATION

In July, 1989, Cimino and Larned, two residents of Texas, filed their respective suits seeking damages for personal injuries based on their claimed exposure to asbestos products allegedly manufactured and distributed by Celotex. The Cimino suit was filed in United States District Court in the Eastern District of Texas, Beaumont, Division. It is styled *Cimino, et al. v. Raymark Industries, et al.* The Larned suit, styled *Larned, et al. v. Kohlbrg, Kravis, Roberts & Co., et al.*, was originally filed in the State Court in Jefferson County, Texas. In due time JWC removed the *Larned* action to the U.S. District Court in the Eastern District of Texas.

Both actions were filed as class actions. However, before either of these suits reached the point of certification of the class, these suits came to halt by virtue of the fact that the Debtors, who were also named as defendants in both suits, filed their respective Petitions for Relief under Chapter 11, on December 27, 1989. This in turn automatically triggered the operation of the automatic stay imposed by § 362 of the Bankruptcy Code and stopped any further proceedings against the Debtors in the two Texas litigations.

In this connection, it should be noted that Celotex, one of the lead Defendants in the two lawsuits, was not a Chapter 11 debtor at the commencement of the Texas suits, or even when the Debtors filed this adversary proceeding. However, it later became a debtor itself when it filed its own Petition for Relief under Chapter 11 of the Bankruptcy Code on October 12, 1990. Its Chapter 11 case is still pending in this District, albeit not before this Court.

## THE COMPLAINT FOR DECLARATORY RELIEF

Shortly after the commencement of the Chapter 11 cases filed by HHC and its subsidiaries, the Debtors filed this adversary proceeding, No. 90–0003. As noted earlier, in this adversary proceeding the Debtors named as Defendants Celotex and JWC, in addition to Cimino and Larned and all others who were the putative members of the classes yet to be certified in the two Texas lawsuits. Even a cursory reading of the Complaint filed by the Debtors in this Court leaves no doubt that it is really nothing more than the flip side of the Texas lawsuits in which Cimino, Larned and the other Asbestos Claimants sought to pierce the corporate veil between Celotex and JWC, and once this is accomplished, to proceed to attack the LBO as a fraudulent transfer in order to be in a position to assert their personal injury claims against the former assets of JWC which were acquired by the Debtors and their subsidiaries through the LBO.

Before discussing the facts relevant to the Motion under consideration, it should be noted that all parties agreed that the right of the Asbestos Claimants to pierce the corporate veil of Celotex is a threshold issue, the resolution of which will without doubt have a profound impact on not only the Chapter 11 cases of the Debtors but also on the fate of Celotex. Accordingly, all parties sought and obtained relief from stay in the Chapter 11 case of Celotex for the limited purpose of litigating the issue of piercing the corporate veil of Celotex.

## HISTORICAL DEVELOPMENT OF THE DEBTORS

In 1946, Mr. James W. Walter joined with Mr. Lou Davenport and formed a partnership for the purpose of building and selling shell homes with completed exteriors and unfinished interiors. Mr. Davenport left the business which was then carried on by Jim Walter, initially as a sole proprietor, under the name of Walter Construction Company. In 1955, Jim Walter incorporated the business under the name of Jim Walter Corporation (JWC).

By 1963, JWC had purchased 61% of the outstanding shares of Celotex common stock, and by 1964, JWC had completed its acquisition of Celotex and Celotex became a wholly-owned subsidiary of JWC. JWC also acquired controlling interests in several other corporations, and by 1970 had be-

come a pure holding company for numerous subsidiaries employed in various business activities including coal and marble mining, and the manufacturing of gypsum board, building materials, and cast iron and ductile pipe.

In April of 1972, Celotex acquired a controlling interest in The Panacon Corporation (Panacon) with $62 million advanced by JWC. Shortly thereafter, Celotex and Panacon merged with the unanimous written consent of the Board of Directors of Celotex and Panacon. At the time of the acquisition by Celotex, Panacon had revenues of $181.1 million, net income of $10.6 million and assets of $106 million in 1971, and employed 5500 people.

In 1974, the Federal Trade Commission (FTC) sued JWC for violation of § 7 of the Clayton Act (15 U.S.C. § 18) in connection with Celotex's acquisition of Panacon. The opinion rendered by the FTC was limited to anti-trust matters and determined that the corporate identity of Celotex should be disregarded for the purposes before the FTC. However, *in dicta* the FTC stated that "we do not imply that the separate incorporation of JWC and Celotex should be disregarded for all purposes; that must be determined in light of the applicable facts and legal principles in each case." The FTC opinion was vacated by the Fifth Circuit Court of Appeals in 1980.

Beginning in the mid–1970's numerous suits were filed against Panacon by parties who claimed to have been injured as the result of alleged exposure to products distributed and sold by Panacon which contained asbestos. After the merger, Celotex was also named as a defendant in numerous law suits filed by asbestos-related personal injury claimants. A great majority of these law suits alleged liability based on pre–1972 activities of Philip Carey Corporation, a predecessor-in-interest of Panacon, which in 1969 merged into the Briggs Manufacturing Company, and which ultimately became the surviving corporation, Panacon.

## METHOD OF OPERATION/CASH MANAGEMENT SYSTEMS

JWC established a central cash management system in the 1970's for all of its wholly-owned subsidiaries. Under this system all excess cash generated by the subsidiaries was transferred to the central cash management account maintained by JWC in Tampa. According to the Debtors, the system was established in order to maximize the efficient use of the pooled funds of the subsidiaries. The pooled funds were used first, to pay the bills of the subsidiaries and also to provide inter-company loans at rates more favorable than those which could be obtained by the subsidiary from outside institutional lenders. Celotex collected its own receivables and paid its own payables, albeit with funds transferred from the cash management account of JWC. Celotex maintained a checking account always with a zero balance, but used same with full credit accorded through inter-company receivable and payable accounts. According to the Debtors, the cash management system was nothing more than "a revolving credit/working capital loan agreement between JWC and its subsidiaries." [Matlock Supp. Aff.II @5]

Celotex had separate bank accounts that operated through lock box arrangements, and Celotex customers sent their payments to the lock box. At the end of each business day, the funds in Celotex accounts were wire transferred to a JWC account, and Celotex received a credit for the funds transferred. Celotex handled disbursements in a similar manner. Celotex decided which bills it would pay, and when it would pay those bills. The bank with which Celotex had its accounts would notify the treasury department of JWC when a Celotex check was presented to the Bank for collection, and JWC would wire transfer funds from a JWC account to cover all checks that were presented to the Bank on that day. JWC and Celotex, like all other subsidiaries of JWC, made separate debit and credit entries in their books to account for all receipts and disbursements.

Celotex maintained an inter-company payable account and an inter-company receivable account with JWC pursuant to the cash management system. According to

the Debtors, the records reflected at all times the balance between Celotex and JWC, including the amount of funds borrowed by Celotex from JWC at any given time, and the amount of funds owed to Celotex by JWC. This accounting system required that all the subsidiaries in JWC maintain strict and separate accounting records for each transaction. Moreover, even individual divisions of subsidiaries also maintained separate records of inter-company payables and receivables under the central cash management system. According to the Debtors, it was understood that all loans by JWC to the subsidiaries were to be repaid by the subsidiaries with interest even though none of these loans were documented as ordinary loan transactions, i.e., by execution of promissory notes payable on demand or with fixed due dates under fixed finance charges. Whether the transfer of these funds was actually repayment of loans as claimed by the Debtors or instead, was return of capital to JWC, as claimed by the Asbestos Claimants, is one of the central issues involved in the Motion under consideration. In this connection, it should be noted that the undisputed fact that these funds were immediately credited against the balance owed by Celotex to JWC under the cash management system does not necessarily compel the conclusion urged by the Debtors that this represented the repayment of inter-company loans.

As part of the cash management system, JWC recouped the interest costs it incurred on money it borrowed from third parties and then in turn, loaned to its subsidiaries through a corporate assessment. The corporate assessment was an interest charge designed to recover JWC's cost of borrowing cash which was used by Celotex and other subsidiaries. The corporate assessment also included a charge to reimburse JWC for the cost of centralized and corporate services provided to the subsidiaries by JWC. The corporate assessment rate was set at the beginning of each year. Between 1982 and 1987, Celotex paid to JWC corporate assessments in the amount of $126.3 million. According to the Debtors, the interest rate associated with the corporate assessment rate was well below

any interest rate that Celotex and the other subsidiaries could have obtained on the open market.

## CORPORATE GOVERNANCE

Each subsidiary had separate corporate minute books and separate accounting records and employees. However, while Celotex hired or fired its lower level employees, decisions concerning senior management required approval by the JWC Board. Each operating company handled all its own promotions, except for those which called for a substantial deviation from established practice. Each subsidiary had its own payroll, and paychecks were issued on accounts in the subsidiary's corporate name. It should be noted that Celotex had its own Board of Directors which generally acted by written consent and rarely met face-to-face.

The Board of Directors of JWC monitored key events of Celotex and other subsidiaries, and provided oversight functions. The Board of JWC discussed certain issues affecting Celotex, including the acquisition and construction of plants, the closing or sale of plants, the acquisition or transfer of assets and the like. However, the Board of Directors of JWC was not involved in the day-to-day operations of the subsidiaries.

JWC established profit centers which were composed of subsidiaries or divisions of subsidiaries to facilitate efficient reporting. Profit centers were designated as operating groups along certain business lines, or in a manner to reflect common business consideration such as product lines, marketing, distribution, or geographic location. For internal purposes, JWC reported the financial status of subsidiaries and divisions by profit center. However, public financial reports were issued for each subsidiary, not for profit centers.

JWC monitored the performance of subsidiaries through its reporting structure. A JWC officer would serve as a liaison between JWC and the subsidiary for reporting purposes. Each officer was assigned to a number of profit centers and would discuss the financial status and oper-

ating reports of the entities in that profit center, after which time the officer would report this data to senior management of JWC. The JWC officers did not perform management functions or act in a decision-making capacity for their respective profit centers.

### DIVESTITURE OF ASSETS BY CELOTEX

It is without dispute that between 1981 and 1983, Celotex lost over $70 million due to the severe economic recession which heavily impacted the construction industry. During this time period, the inter-company liability of Celotex reached $291 million. Beginning in 1982, Celotex established a divestiture program and sold 26 of its divisions and subsidiaries to JWC, other JWC subsidiaries and unrelated third parties. These sales produced $165 million which, according to the Debtors, was used by Celotex to reduce its inter-company liability to JWC. According to the Asbestos Claimants, these sales resulted in Celotex's divestiture of approximately half of its assets, although this Court is unable to determine the precise impact of the sales in Celotex's net worth based on this record.

### CONTENTIONS OF ASBESTOS CLAIMANTS

The divestiture of assets by Celotex is the heart of the Asbestos Claimants claim that the corporate veil of Celotex should be pierced and JWC should be liable for the personal injury claims of the Asbestos Claimants. The central point of this claim is based on the allegations that JWC, the parent, misused and disregarded the separateness of JWC and Celotex and orchestrated the methodical divestiture of valuable assets of Celotex and then funnelled the proceeds of these sales in the guise of repayment loans to JWC which, according to the Asbestos Claimants, were at most a return of capital and not repayment of bona fide loans.

The Asbestos Claimants contend that there are genuine issues of material fact which would prevent the disposition of the controversy in favor of the Debtors as a matter of law. In the alternative, they contend that under the applicable legal principles, the Debtors are not entitled to a judgment as a matter of law, even if the Court finds that there are no genuine issues of material fact.

A close analysis of the undisputed facts of this record, together with the argument of the Asbestos Claimants leaves no doubt that they really do not challenge the historical facts, but that they certainly draw different inferences and conclusions from those facts. The classic scenario under which attempts have been made to pierce the corporate veil involve a closely-held corporation where creditors of the corporation seek to impose personal liability on the principals of the corporation. *See, e.g., Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1940). However, this is not what is involved in the matter under consideration. What is involved is an attempt to destroy the separate legal existence of an entity which was properly created and functioned as a bona fide corporation which fully complied at all times with all the formalities required by applicable law. Notwithstanding, the Asbestos Claimants contend that the cash management system, the divestiture of assets, and the alleged total domination and control of JWC over the affairs of Celotex may warrant piercing the corporate veil of Celotex, if they are given an opportunity to establish their claims at a full scale evidentiary hearing.

■ In resolving this matter, it should be noted at the outset that one of the basic principles of American corporate law is the rule that a properly formed corporation is an independent and separate legal entity with a life of its own from not only those who originally formed the corporation, but also from any shareholder, including a corporation who owns shares in another, i.e., parent and wholly-owned subsidiaries. *See, e.g., Cancun Adventure Tours, Inc., v. Underwater Designer Co.*, 862 F.2d 1044, 1047 (4th Cir.1988). In order to destroy the independence and separateness of the validly-created legal entity, either under the law of Delaware, the place of incor-

poration of Celotex, or under the laws of this state, it is the claimant's burden to establish 1) that the shareholder dominates and controls the corporation to such an extent that the corporation has no independent existence; 2) the corporate form must have been used fraudulently or for an improper purpose; and 3) the fraudulent or improper use of the corporate form must have caused the claimant injury. *See In re Rodriguez*, 895 F.2d 725, 796, n. 6 (11th Cir.1990); *Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So.2d 1114 (Fla.1984); *Mobil Oil Corp. v. Linear Films Inc.*, 718 F.Supp. 260 (D.Del.1989).

■ The principles governing disposition of controversies without trials, Fed. R.Civ.P. 56, has been adopted by Bankruptcy Rule 7056 in toto. Clearly, the principles which govern the application of Fed. R.Civ.P. 56 are equally applicable if motions for summary judgment are filed in a bankruptcy court, either in the context of an adversary proceeding or in a contested matter pursuant to F.R.B.P. 9014.

■ Based upon this voluminous record one might at first blush conclude that the limited aspect of the adversary proceeding concerning piercing of the corporate veil may be resolved as a matter of law, based on the assumption that through the extensive discovery, one might rightfully conclude that there are indeed no genuine issues of material fact. However, this is not an ordinary veil piercing case and, upon careful consideration of the entire record this Court concludes that resolving this precise and narrow issue under consideration as a matter of law would not be proper and fair for the following reasons.

The most crucial aspects of this controversy are (1) the precise manner of the operation of the cash management system, (2) the record-keeping account activities by JWC and its subsidiaries, including Celotex, and (3) most importantly, the extent of the control exercised by JWC over the affairs of Celotex, especially the extent of JWC's involvement in the decision-making process of the divestiture program of Celotex referred to earlier. Specifically, this Court must determine whether the sales by Celotex of its divisions were done for legitimate business purposes or whether they were done solely for the purpose of denuding Celotex of assets in order to keep those assets out of the reach of the Asbestos Claimants and to funnel the proceeds of these sales to JWC. This, in turn, brings into consideration whether or not the transfer of funds derived from the divestiture of Celotex's assets and those made in connection with the cash management system were, in fact, repayment of bona fide loans, loans which were properly documented, or nothing more than a return of equity to JWC.

Although it appears that some of the material facts are undisputed, the parties dispute the inferences which may be drawn from those facts. As the Eleventh Circuit Court of Appeals has stated, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir.1985). Therefore, this Court is satisfied that the Motion For Summary Judgment must be denied. Further, in light of the fact that all these questions involve the mental attitude of the principal players and the subjective motivation of the parties involved, it would be improper to resolve this question without giving the Asbestos Claimants an opportunity to test the truthfulness of the parties on cross examination.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Motion For Summary Judgment is hereby denied. It is further

ORDERED, ADJUDGED AND DECREED that a continued pretrial conference is scheduled for September 8, 1992 at 1:30 p.m. in Courtroom A, 4921 Memorial Highway, Tampa, Florida.

DONE AND ORDERED.