570 So.2d 386 (1990)
USP REAL ESTATE INVESTMENT TRUST, a Business Trust, Appellant,
v.
DISCOUNT AUTO PARTS, INC., a Florida Corporation, Appellee.
No. 88-1081.
District Court of Appeal of Florida, First District.
November 16, 1990.
Rehearing Denied December 26, 1990.
Frederick R. Brock and Babette LaMaster Fletcher of Gartner, Phillips, Brock & Simon, Jacksonville, for appellant.
Judith S. Beaubouef and William S. Graessle of Mahoney, Adams, Milam, Surface & Grimsley, P.A., Jacksonville, for appellee.
ZEHMER, Judge.
This is an appeal from a final judgment, entered pursuant to a bench trial, denying relief on the complaint of appellant, USP Real Estate Investment Trust (USP), that *387 sought to hold appellee, Discount Auto Parts, Inc., (Discount), legally liable to pay a judgment against Discount's wholly-owned subsidiary, Discount Auto Parts # 90 North Florida, Inc., (# 90 North). We reverse, holding that the trial court erred in failing to pierce the corporate veil under the circumstances shown in this record, and remand for entry of judgment for USP.

I.
The evidentiary facts presented at trial are not materially in dispute. This case arose out of a 1981 agreement (the lease) between USP, as landlord, and Sunbelt Car Care Mart, Inc., (Sunbelt), as tenant, leasing retail store space in a shopping mall in Orange Park, Florida, for a term of five years commencing April 15, 1981. The nine-page agreement contained extensive terms, including the following provisions governing the use of the premises (article IV) and assignment or subletting of the lease (article XII):
IV. Tenant shall use and occupy the Premises for the purpose of operating an auto parts retail store and shall not use or occupy the Premises or permit the same to be used for any other purpose. Tenant agrees to maintain business hours in keeping with guidelines established by the Merchant's Association.... During the term hereof, Tenant shall be in continuous use and occupancy of the Premises and shall not vacate the same.
... .
XII. Tenant shall not, either voluntarily or by operation of law, sell, assign, hypothecate or transfer this lease, or sublet the Premises or any part thereof, or permit the Premises or any part thereof to be used for any purpose other than as set forth in Article IV hereof, without the prior written consent of Landlord in each instance, such consent will not be unreasonably withheld, but Landlord may attach such conditions to such consent as it deems appropriate. Any rentals collected by Tenant by virtue of an assignment or subletting consented to by Landlord, over and above the rentals due from Tenant under the provisions of this lease shall be, at the option of Landlord, payable to Landlord as additional rent hereunder. Any sale, assignment, mortgage, transfer or subletting of this lease or the Premises or any part hereof or thereof which is not in compliance with the provisions of this Article XII shall be void and shall, at the option of Landlord, terminate this lease. The consent by Landlord to an assignment or subletting shall not be construed as relieving Tenant from obtaining the express written consent of Landlord to any further assignment or subletting or as releasing Tenant from any Liability or obligation hereunder whether or not then accrued.
In January 1984, Sunbelt's lease with USP was assigned to # 90 North as part of a transaction in which Discount acquired Sunbelt's auto parts business being operated on the leased premises. In September 1983, Discount and Sunbelt executed an agreement for the acquisition of Sunbelt's retail auto parts business entitled Contract for Sale and Purchase of Business (Contract), naming Discount as buyer and Sunbelt as seller. The terms of the Contract provided for the purchase of Sunbelt's entire business located at Orange Park and three other locations, including Sunbelt's business name, the inventory located on the leased premises in Orange Park and other places, "fixtures, equipment, signs, shelving, leasehold improvements owned by [Sunbelt] at depreciated book value (3-31-83) & other leasehold & equipment assets." It provided that the transaction "shall be closed and the Bill of Sale and Possession shall be delivered on or before the 4 day of January, 1984; unless extended by other provisions of this contract," and set the closing in Sunbelt's offices on Baycenter Road in Jacksonville. The Contract required the seller to "convey ownership to the Buyer by Bill of Sale; the property being conveyed is according to the schedule hereto attached and made a part hereof." While the copy of the Contract in the record has no schedule attached, attached to the bill of sale ultimately executed by Sunbelt on January 4, 1984, conveying certain property to Discount, was a schedule describing the following: "All tangible assets *388 including but not limited to: inventory; leasehold improvements; furniture, fixtures and equipment; leases; name `Sunbelt Car Care Mart'; signs; but specifically excluding: cash; accounts receivable; consigned goods;[1] claims of Sunbelt" (emphasis added). There is no evidence that this schedule is any different from the schedule referred to in the Contract. The Contract also required the seller "to authorize buyer to interface with seller in all areas of operation after 10-4-83." As to the lease with USP, the Contract specifically provided: "THIS AGREEMENT in the contemplated sale is contingent upon the buyer approving the leases that seller has at [Orange Park and other locations] prior to closing, which is satisfactory to the buyer and/or executing an assignment of the seller's lease and/or the parties agreeing to execute a sublease." Matthew J. Ott signed the Contract as president of Sunbelt. Denis Fontaine, who was president of Discount and its subsidiary # 90 North, signed the Contract as president of Discount.
The closing of the transaction occurred on January 4, 1984, as specified in the Contract.[2] At that time, the absolute bill of sale described above was executed by Ott for Sunbelt and by Denis Fontaine as president of Discount. The bill of sale was held by Sunbelt's attorney and later sent to Discount by letter dated January 13, 1984. Ott also executed the consignment agreement at the closing, transferring certain consignment goods to # 90 North rather than to Discount, and this consignment agreement was executed by Denis Fontaine as president of # 90 North.
Following the closing, a representative of Sunbelt, not otherwise identified in the record, obtained an assignment of the USP lease as required by the Contract. No representative of Discount or # 90 North contacted USP regarding its consent to the assignment, and it does not appear that USP contacted anyone at Discount or # 90 North about the assignment. The single page form of assignment contained three separate provisions: the top one effecting an assignment of the lease by Sunbelt to # 90 North, executed by Ott on January 16, 1984; the middle one effecting an acceptance of the assignment by # 90 North, executed by Denis Fontaine as president of # 90 North on January 25; and the bottom provision effecting a consent to the assignment, executed on January 6, 1984, by Mr. Ronald R. Pitts on behalf of USP.[3] The executed assignment was transmitted to "USP Trust" in Cedar Rapids, Iowa, by letter dated January 31, 1984, bearing the business letterhead of "Discount Auto Parts," indicating corporate offices in Lakeland, Florida. The text of the letter read: "Please find enclosed a fully executed copy the the [sic] Assignment of Business Lease between USP Real Estate Investment Trust, Sun Belt [sic] Car Care Mart, Inc., and Discount Auto Parts, Inc." It was signed by Denis Fontaine as president of Discount. Following the sale of its business to Discount, Sunbelt was dissolved as a Florida corporation.
After the assignment of the lease and completion of the transaction, Discount operated a retail auto parts business on the leased premises and made all the monthly rental payments due thereunder directly to USP through March 1985. By letter dated April 9, 1985, Clifford J. Wiley, real estate manager for Discount, notified USP's managing agent, Paul Steighner of Cury Properties, that Discount had closed its store in Orange Park, "is anxious to get the premises relet or sublet," and "would appreciate your company's assistance in finding a new tenant for this property." The letter stated that Wiley would "have the keys brought by to your office." The leased *389 premises were immediately abandoned, and this litigation followed.
USP initially brought suit against Ott as a former director of Sunbelt, a dissolved corporation, and against # 90 North. It obtained a judgment against both for damages for breach of the lease agreement. USP then undertook discovery in aid of execution of the judgment and, according to USP, it learned for the first time that Discount and # 90 North were not the same, but were separate corporate entities. As a result, USP obtained a court order impleading Discount as a third party defendant. Its third party complaint alleged that Discount and # 90 North should not be treated as separate corporate entities because Discount had persistently disregarded the separate corporate status of # 90 North and, therefore, Discount should be held liable for USP's judgment against # 90 North.
Testimony at trial established the following additional facts without dispute. Sunbelt's attorney understood that the lease was assigned to # 90 North because that entity was going to be operating that location where the consigned merchandise was located; as a result, Sunbelt got # 90 North as well as all other "Discounts" to execute UCC-1's. Delivery of the bill of sale executed on January 4, 1984, was withheld by him until a consent to assign each of the leases involved in the transaction had been obtained from the respective landlords.
Paul Steighner, who appeared at trial as USP's representative, managed the leasehold properties at USP's Orange Park shopping center but was not involved in any negotiations regarding the assignment and had no discussions about it with anyone from Discount or # 90 North. He received the notice from Discount that it was leaving the premises and, after some delay, obtained the keys from Mr. Wiley. When the rent first became overdue, he contacted Mr. Wiley of Discount in an attempt to collect it. He never inquired why Discount was operating the store rather than # 90 North because he was unaware that # 90 North even existed. He was unaware of the distinction between Discount and # 90 North, and explained that "to my knowledge, there was no one that knew that there was the distinction between 90 and Discount Auto Parts." He viewed them as one entity until much later, after Discount left. So far as he knew, however, no one from USP ever inquired of Discount or # 90 North about their financial condition, and no representations concerning that subject were ever made to him by representatives of either corporation.
The evidence also established that # 90 North was created in 1983 by Discount for the ostensible purpose of holding the lease to a premises to be used by Discount as a retail store. It was to be capitalized with 100 shares of stock having a par value of $1.00 each, all owned by Discount. Its officers were the same as Discount's. Danny Crow, the chief financial officer for Discount, described the operation of # 90 North and its relationship to Discount. He testified that # 90 North was "in the rental business" and had received a lease by assignment from Sunbelt, which it then leased or subleased to Discount to operate its retail auto parts store on the premises. He explained that # 90 North never had a bank account; it reported no income for the two years that it filed federal and state corporation income tax returns; it never had any inventory; it never had any receipts or expenditures, and its general ledger reflected no entries for rental payments; there were no invoices or bills from # 90 North to Discount in connection with the alleged rental arrangement, and # 90 North had no written lease or sublease agreement with Discount; it never paid any sales tax on the alleged rentals it was supposed to have received from Discount, although such would have been due had it received rental income; the $100 subscription for the capital stock was never paid, but was shown on # 90 North's ledger as a receivable; and this 1983 entry is the only entry in # 90 North's accounting ledger.
Denis Fontaine's testimony on behalf of Discount affirmed that the Contract for Sale and Purchase was made by Discount and was never assigned to any subsidiary corporation, that the bill of sale was never *390 amended by any written document, and that # 90 North was formed in 1983 for the sole purpose of holding a shopping center lease for a retail store to be operated by Discount. He served as president of both Discount and # 90 North, and his brother, Peter, was secretary-treasurer of both corporations. Discount owned all the stock of # 90 North. Discount was the operating arm of the auto parts business, and # 90 North held the lease assigned by Sunbelt in the purchase and sale transaction. However, # 90 North never had any employees, and the $100 was never paid for the stock capitalization. Discount provided the financing for everything at # 90 North. There was never a sublease agreement between # 90 North and Discount, and Discount paid the monthly rental payments directly to USP during the entire time that rental payments were made. The purpose of placing the lease in # 90 North was to insulate Discount from liability to the landlord. As a result, Fontaine explained, when Discount decided to close the store, there was no responsible party to pay rents for the balance of the lease except the prior tenant, Sunbelt. Fontaine agreed that Clifford Wiley notified USP about cancelling the lease in his capacity as real estate manager for Discount. Neither Fontaine nor any other representative of Discount or # 90 North had any contact or discussions with USP regarding the assignment of the lease.
The trial court declined to pierce the corporate veil and hold Discount liable for USP's judgment against # 90 North. Among the specific findings of fact recited in the final judgment are the following: USP proved that # 90 North "is a mere instrumentality of Discount Auto Parts, Inc."; but USP failed to prove by the greater weight of the evidence that # 90 North "was organized or used to mislead creditors or to perpetuate [sic] a fraud upon creditors"; USP "consented to the assignment of a lease" from Sunbelt to # 90 North and "said assignment actually transpired"; USP "neither sought nor received any information concerning the financial condition or status of" # 90 North or Discount, and, therefore, "there were no misrepresentations which would have misled the Plaintiff nor was there any fraud involved in the obtaining of the assignment of the lease"; USP "was aware of the assignment of lease to" # 90 North; # 90 North "was established to limit liability and serve a business convenience"; and this "is a proper utilization of the laws of the State of Florida and the corporate veil will not be pierced absent a showing of some illegal, fraudulent, or other unjust purpose."

II.
We conclude that the trial court's judgment is in error because the court has misinterpreted the undisputed evidence and its legal effect.
The parties are in agreement that the applicable legal principles are set forth in Dania Jai-Alai Place, Inc. v. Sykes, 450 So.2d 1114 (Fla. 1984). In that case, the supreme court made it clear that to pierce the corporate veil under Florida law, it must be shown not only that the wholly-owned subsidiary is a mere instrumentality of the parent corporation but also that the subsidiary was organized or used by the parent to mislead creditors or to perpetrate a fraud upon them. Since the trial court found that # 90 North was a mere instrumentality of Discount and Discount agrees with that finding on this appeal, the critical issue before us is whether the record will support the trial court's conclusion that Discount did not use # 90 North to mislead creditors or perpetrate a fraud on them.
In addressing this issue, it is important to understand the theory underlying piercing the corporate veil and the type of conduct described in the supreme court's Dania decision as sufficient to constitute misleading or improper conduct that will warrant holding the subsidiary to be the alter ego of the parent. The court, in discussing its decision in Mayer v. Eastwood-Smith & Co., 122 Fla. 34, 164 So. 684 (1935), noted reliance on Biscayne Realty & Insurance Co. v. Ostend Realty Co., 109 Fla. 1, 148 So. 560, 564 (1933), and quoted as follows from its opinion in Mayer:

*391 "So long as proper use is made of the fiction that corporation is entity apart from stockholders, fiction will not be ignored... . Where stockholders enter into a transaction in individual interests and utilize corporate name merely to mislead creditors or perpetrate fraud, legal entity will be ignored and stockholders held individually liable... . The rule that corporate entity will be disregarded where name of corporation is used by stockholders in transactions to mislead creditors or perpetrate fraud on them is but a logical sequence of the principle that a corporation cannot be formed for the purpose of accomplishing fraud or other illegal act, under the guise of fiction that the corporation is legal entity separate and distinct from its members, since when fraud or illegal act is attempted, fiction will be disregarded by the court and the acts of the real parties dealt with as though no corporation had been formed."
Mayer, 122 Fla. at 42-43, 164 So. at 687. We then went on:
"The overwhelming weight of authority is to the effect that courts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose, or is a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose."
Dania, 450 So.2d at 1117. The court then discussed its decision in Barnes v. Liebig, 146 Fla. 219, 1 So.2d 247 (1941), making the following pertinent observations:
Looking more closely at the Alabama case [Jefferson County Burial Soc'y v. Cotton, 222 Ala. 578, 133 So. 256 (1930)] on which the Barnes court relied, we see that the two corporations were a sham, that the negligent employees worked for both corporations, and that the ambulances, hearses, and other properties of the two corporations were used interchangeably without regard to corporate identity. In other words, the stockholders and the corporations improperly disregarded the corporate identities.

Dania, 450 So.2d at 1118 (emphasis added). The court then quoted from its decision in Riley v. Fatt, 42 So.2d 769, 773 (Fla. 1950):
The rule is that the corporate veil will not be pierced, either at law or in equity, unless it be shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them.... In the absence of pleading and proof that the corporation was organized for an illegal purpose or that its members fraudulently used the corporation as a means of evading liability with respect to a transaction that was, in truth, personal and not corporate, Fatt cannot be heard to question the corporate existence but must confine his efforts to the remedies provided by law for satisfying his judgment from the assets of the corporation, if any can be found.
Dania, 450 So.2d at 1119-20. The court then discussed its decision in Advertects, Inc. v. Sawyer Industries, Inc., 84 So.2d 21 (Fla. 1955):
In [Advertects, Inc.] we rejected the proposition that a rule could be issued against individual stockholders to show cause why they should not be personally responsible for corporate debts absent a preliminary showing
that the corporation is in actuality the alter ego of the stockholders and that it was organized or after organization was employed by the stockholders for fraudulent or misleading purposes, or in some fashion that the corporate property was converted or the corporate assets depleted for the personal benefit of the individual stockholders, or that the corporate structure was not bona fidely established or, in general, that property belonging to the corporation can be traced into the hands of the stockholders.
It isn't sufficient merely to show that the corporation exists and that there are a limited number of stockholders doing business in good faith through the corporate entity. From a procedural standpoint we hold that a *392 showing similar to that suggested in summary above be made before the rule nisi is issued and directed against the individual stockholders. If this requirement were not made then every judgment against a corporation could be exploited as a vehicle for harassing the stockholders and entering upon a fishing expedition into their personal business and assets.

Id. at 24. In so holding we stated the controlling law on piercing the corporate veil and delineated why it was so.
The corporate veil will not be penetrated either at law or in equity unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them.
Every corporation is organized as a business organization to create a legal entity that can do business in its own right and on its own credit as distinguished from the credit and assets of its individual stockholders. The mere fact that one or two individuals own or control the stock structure of a corporation does not lead inevitably to the conclusion that the corporate entity is a fraud or that it is necessarily the alter ego of its stockholders to the extent that the debts of the corporation should be imposed upon them personally. If this were the rule, it would completely destroy the corporate entity as a method of doing business and it would ignore the historical justification for the corporate enterprise system.

Id. at 23-24.
Dania, 450 So.2d at 1120.
Testing the undisputed circumstances shown in the case before us against the supreme court's analysis in the Dania decision, it is readily apparent that Discount, as the parent corporation, organized and used # 90 North as a mere instrumentality to mislead USP in respect to the assigned lease on the shopping center property and thereby avoid any liability for rent should it elect to abandon the leasehold. # 90 North was never operated as a bona fide corporation; its capital stock was never paid; it never had any assets other than the assigned lease; it never opened a bank account or had any funds of its own, but was at all times dependent on the credit of its parent, Discount; it never had any employees, but shared the same officers with Discount; it had no income and never recorded any financial transactions after the initial entry in the ledger posting the capital stock as a receivable; it never billed Discount for subleasing the property from # 90 North although Discount always paid the rental directly to USP; and it simply had no business purpose other than to act as an insulating entity between Discount, as the real operating arm of the business, and the landlord, USP. Discount was the party that used the leased premises and at all times dealt with the leased premises as its own. It was Discount, not # 90 North, that abandoned the leasehold and gave notice thereof. Both Discount and # 90 North were operated interchangeably, as Discount took title and possession to the assets transferred by the bill of sale, while # 90 North ostensibly took possession to the consigned goods, although # 90 North had no financial or inventory record of its own to reflect that it actually did so.
While it may be argued that these recited facts, admittedly undisputed, establish only that # 90 North was a mere instrumentality of Discount, these facts must also be viewed in light of the operative provisions of the assigned lease that both Discount and # 90 North violated in accomplishing the stated purpose of insulating Discount's liability while keeping USP completely uninformed. The lease, assigned by Sunbelt with USP's consent and ostensibly accepted by # 90 North, required that the tenant, that is, # 90 North, actually occupy the premises and operate the retail auto parts business therein. The obvious purpose of this provision was to require that the tenant be an operating company, not a mere passive entity created solely to hold the lease. Neither Discount nor # 90 North ever informed USP that the operating entity in possession of the leased premises was a different entity from # 90 North. Moreover, even if the transaction were to be treated as a sublease by # 90 North to Discount, as suggested by Discount's chief *393 financial officer, there was no evidence of any such sublease, and, more importantly, no attempt was made by either # 90 North or Discount to obtain USP's consent to such sublease, although this was clearly required by the explicit terms in article XII of the lease. Such intentional violation of the clear provisions of the lease, viewed in context with the facts recited above, can legally support no inference other than that Discount was using # 90 North, in total disregard of the separate corporate entity, for the sole purpose of misleading USP as to the true nature and relationship of the two corporations. We hold that the undisputed facts shown in this record require, as a matter of law, that the corporate veil be pierced and # 90 North be treated as the alter ego of its parent, Discount.
Discount argues that the appealed order should be affirmed because the record lacks evidence of fraud or misleading conduct in that USP never made any inquiry as to the financial condition of either corporation, neither Discount nor # 90 North ever made any misrepresentations of material fact concerning the corporate entities or their financial condition, and USP at all times knew that # 90 North held the lease and was distinct from Discount. The final judgment reflects that the trial court relied heavily on this argument. We find it unavailing for the following reasons. USP was entitled to rely on the terms of its lease and assume that the tenant would comply with its provisions without making further inquiry. Thus, USP was entitled to assume that the corporate entity holding its lease would be the operating arm of the retail business owning and holding the assets used in that business. It was not incumbent upon USP to prove that Discount or # 90 North made any fraudulent representations to it in connection with its financial condition. Discount's use of the lease in violation of its terms and without USP's knowledge and consent is sufficiently improper and misleading under all the circumstances shown in this case to warrant piercing the corporate veil. The record contains no evidence establishing that USP had knowledge of the ostensible relationship and business dealings between Discount and # 90 North; the testimony of USP's representative established the contrary, that it was believed Discount and # 90 North were one and the same. The record simply fails to contain competent, substantial evidence to support the trial court's findings and conclusions in this regard.
This is not to say that a subsidiary corporation could not be validly organized and used to hold a leases to premises operated by Discount, as was the purpose stated by its president, Denis Fontaine. Had # 90 North been properly capitalized in accordance with the law and operated as a corporate entity separate and apart from Discount, and had Discount and # 90 North complied with the provisions in the assigned lease and made full disclosure thereof to USP, the result in this case might well have been that found by the trial court. However, on this record, we find it necessary to reverse the judgment and remand for entry of judgment for USP in accordance with this opinion.

III.
In view of the above disposition, we find it unnecessary to discuss any of the remaining arguments made by the parties.
REVERSED AND REMANDED.
SHIVERS, C.J., concurs.
BARFIELD, J., dissents with opinion.
BARFIELD, Judge, dissenting.
I must disagree with the majority in its conclusion that the trial court misinterpreted the undisputed evidence and its legal effect. Quite to the contrary, the majority has read into the facts an inference that could only have been drawn by the trial judge and was not drawn, i.e., "that Discount, as the parent corporation, organized and used # 90 North as a mere instrumentality to mislead USP in respect to the assigned lease on the shopping center property". (emphasis added). The majority recited quite correctly that USP executed the assignment of lease, consenting thereto, *394 without questioning anybody concerning the identity of the participants in this transaction. USP may have been outsmarted, but it wasn't defrauded or misled except by its own ineptness and inattention. A simple inquiry by USP as to the identity and status of the parties and their financial responsibility would have allowed it to make an informed judgment on its consent to the lease assignment. Such inquiry would be a normal prudent business practice. The result could have been the acceptance of the shell corporation, the requirement of a guarantee by the parent corporation, or refusal to consent to the assignment. This court has no business protecting USP or anyone else from its exercise of poor judgment. Neither should we reinterpret facts clearly understood, considered, and interpreted reasonably by the trial court.
NOTES
[1] A subsidiary of Sunbelt, The Parts House, transferred certain consigned goods in its possession to Discount pursuant to the Contract of Purchase and a consignment agreement executed by Sunbelt and Discount on January 4, 1984.
[2] This date was established without dispute by Herman Paul, attorney for Sunbelt at the closing. We reject as not supported by the record Discount's construction of Paul's testimony as being that he was unable to recall when the closing occurred.
[3] Neither Mr. Ott nor Mr. Pitts testified at trial.