632 So.2d 178 (1994)
Ian WALTON, Appellant,
v.
TOMAX CORPORATION, et al., Appellees.
No. 93-1386.
District Court of Appeal of Florida, Fifth District.
February 11, 1994.
Randy Hillman of Reiss, Hillman & Reiss, Orlando, for appellant.
Joseph Charles Rubel, Orlando, for appellee McGuire.
No Appearance for appellee Tomax Corp.
PETERSON, Judge.
Ian Walton, the plaintiff below, appeals a final judgment entered in favor of Hubert McGuire. The final judgment was entered after the trial court granted Hubert McGuire's motion for directed verdict after Walton presented his case in chief in a jury trial. We reverse.
Walton's complaint alleged that he is a resident of England and paid a $20,000 deposit on a home to be constructed by Tomax Corporation in Orange County, Florida. Under the contract the deposit was to be returned if the contract was not performed, and it is uncontroverted that Tomax breached the contract. While the complaint originally contained six counts, we find merit only in the appeal with respect to Count VI, an action for breach of contract against McGuire personally based on Tomax's failure to return Walton's $20,000 deposit. Walton alleged that McGuire should be held personally liable for Tomax's breach because Tomax was the "alter ego" of McGuire and that the corporate veil of Tomax should be pierced rather than allowing it to shield McGuire from responsibility. The trial court entered a directed verdict on Count VI indicating that the evidence presented by Walton was insufficient to hold McGuire personally liable for the breach of contract by Tomax. We disagree and find that the trial judge erred by ordering a directed verdict.
The evidence indicates that Walton negotiated for the construction of the home while on vacation in Florida and then wired the deposit to Tomax on August 20, 1990. Although Tomax acknowledged receipt of the funds, Walton heard nothing more after that and was not successful in his attempts to contact McGuire, the president and chief executive officer of Tomax. Walton retained Florida counsel to investigate and learned that Tomax did not own the lot upon which Tomax represented that the home would be *179 built and that Tomax was not going to build the home. In late November, 1990, Tomax filed its petition for bankruptcy.
McGuire testified that Tomax was incorporated in July, 1983 but ceased operations in November, 1990. He ran the daily operation of the corporate business and possessed the contractor's license that allowed Tomax to construct homes. Although his wife was the sole stockholder in the corporation and its secretary-treasurer, she did not participate in its management. He testified that during its seven years of operation Tomax constructed between 100 and 120 homes and grossed approximately $13 million in sales, but that it began experiencing financial difficulties a year before filing bankruptcy. By June, 1990, he testified, Tomax was unable to pay its bills.
The evidence which the trial judge found to be insufficient to support the allegations contained in Count VI of Walton's complaint and thereby relieve McGuire of presenting a defense includes:
1. Tomax made payments on McGuire's personal credit card. McGuire claims that he had used this card to provide funds in the amount of $13,000 for corporate use and that Tomax was simply repaying him by making payments directly on his credit card.
2. On the day that Tomax filed for bankruptcy, it issued a check in the amount of $2,000 to Thomas McGuire, McGuire's son and Tomax's vice president. McGuire claims that this represented a payment of salary, although no deductions were made for federal payroll taxes or withholding and the amount does not bear a relationship with previous payroll checks paid to him.
3. McGuire's wife received checks from Tomax in the amount of $300 per week although she did not participate in conducting its business. McGuire could only claim that the checks were issued to repay a loan from her or to repay capital in the form of dividends. He could only refer Walton's attorney to his accountant for an explanation.
4. McGuire received checks from Tomax in denominations of $50, $100 and $200. These payments were in addition to his $78,000 annual salary and reimbursements for travel and car expenses. He claims that the checks were to cover his business expenses, but he was unable to explain exactly what the checks covered.
5. Tomax paid in excess of $7000 to Storehouse Ministries of Central Florida, Inc. in 1990. This was a ministry headed by McGuire's son, Thomas, the vice-president and director of Tomax who received $2000 on the date Tomax filed bankruptcy. McGuire claimed that Storehouse feeds 250-300 needy people per week and that he caused the corporation to make the donations in order to contribute to the community.
6. On November 29, 1990, a closing took place of the sale of a home constructed by Tomax. The proceeds of the sale were $23,501. McGuire admitted receiving these funds personally rather than depositing them in the corporate account. McGuire claimed that he was entitled to receive those funds because he had personally financed the initial purchase of the property upon which Tomax constructed the home and therefore the $23,501 check represented a partial repayment of his loan.
7. McGuire's daughter-in-law had been paid $750 by Tomax. There was no explanation for the payments other than McGuire indicating that $150 of the amount was paid as a fee for acting as an interpreter to translate Spanish to English.
8. A one thousand dollar donation was made to another charity in August, 1990. McGuire's son had a historical connection with the charity. McGuire claimed that although Tomax was experiencing financial difficulties when the donation was made, he expected to obtain a $20 million loan to keep the corporation operating; unfortunately the loan was never received.
Both Walton and McGuire rely heavily upon Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114 (Fla. 1984), to support their positions. That opinion reviews at length the Florida law applicable to piercing the corporate veil. The procedural issue there, as it is here, was, "[U]nder the evidentiary facts presented to the trial court, was the court correct in taking the issue from the jury and directing a verdict against Dania?" Id. 450 *180 So.2d at 1121. In finding error, the supreme court stated:
In granting a motion for directed verdict, the Court must determine that there is no evidence to support a jury finding for a party against whom the verdict is sought. Cadore v. Karp, 91 So.2d 806 (Fla. 1957). It does not lie within the province of the Court to weigh evidence or determine questions of credibility and, where there is a possibility of different conclusions or inferences from the evidence the Court should submit the issue to the jury. Bruce Construction Corp. v. The State Exchange Bank, 102 So.2d 288 (Fla. 1958). See also 25 F.L.P., Verdict, § 9.
Id. at 1121. Earlier in the opinion the supreme court summarized what should be shown before an individual stockholder is to be burdened with going forward with evidence to show why the corporate veil should not be pierced. A preliminary showing is required:
that the corporation is in actuality the alter ego of the stockholders and that it was organized or after organization was employed by the stockholders for fraudulent or misleading purposes, or in some fashion that the corporate property was converted or the corporate assets depleted for the personal benefit of the individual stockholders, or that the corporate structure was not bona fidely established or, in general, that property belonging to the corporation can be traced into the hands of the stockholders.

Id. at 1120, quoting Advertects, Inc. v. Sawyer Industries, 84 So.2d 21 (Fla. 1955) (emphasis added).
The record here indicates that there was evidence that, although Tomax could not pay its debts as early as June, 1990, McGuire caused it to continue to operate until it filed bankruptcy in late November, 1990. The record also indicates that, during that time, McGuire may have caused the corporation to make inappropriate corporate distributions to himself and his family at the expense of Walton and other corporate creditors in what may be eventually determined by the jury to be consumption or depletion of corporate assets for their personal benefit. See Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114, 1120. McGuire caused Tomax to disburse corporate funds to charities to which his son was closely affiliated, and to his son for salary in the round amount of $2,000 although his son had been previously receiving a fixed amount of $662.10 per week. McGuire caused Tomax's funds to be paid to himself in the amount of $23,501.01[1] even though the funds were clearly the proceeds of a residential closing that belonged to Tomax when it had been unable to pay its debts for a period of at least four months. Just before Tomax filed a petition in bankruptcy, McGuire also caused Tomax to make largely unexplained distributions to a daughter-in-law. Additionally, corporate agents induced Walton to make a $20,000 deposit "in order to justify taking the property [the lot upon which Walton's home was to be constructed] off the market" at a time when Tomax could not pay its debts but when McGuire and his son continued to receive their regular salaries as though business was to continue "as usual." The property was never owned by Tomax and the evidence does not indicate that steps were ever taken to obtain the property after receipt of the deposit. Furthermore, the correspondence from Tomax to Walton regarding the construction of their home came to an abrupt halt after Tomax acknowledged receipt of the deposit. Corporate checks placed in evidence indicated that McGuire's weekly net salary of $1413 did not experience similar cessation.
Although McGuire attempted to explain the various disbursements when he was called as an adverse witness during Walton's case-in-chief, there was evidence which, if accepted by the jury, tended to show that McGuire depleted corporate assets for the personal benefit of himself and his family while the corporation was unable to pay its *181 debts.[2] Accordingly, the directed verdict was improper. Dania Jai-Alai Palace, Inc.
The judgment in favor of McGuire is affirmed on all counts of Walton's complaint except as to Count VI. We vacate the judgment as to that count and remand to the trial court so that it may conduct a jury trial on that count alone.
AFFIRMED IN PART; REVERSED IN PART.
COBB and W. SHARP, JJ., concur.
NOTES
[1] This substantial amount was taken by McGuire almost simultaneously with Tomax's filing for bankruptcy. He was fully aware that Walton and others had paid deposits on homes, the construction of which had never begun.
[2] It makes no difference that McGuire himself was not a shareholder of the corporation, because if a corporate officer who is in control of a corporation personally utilizes its assets for payment of personal obligations and generally treats the corporation as a sham, he can be liable on an alter ego theory. Bermil Corp. v. Sawyer, 353 So.2d 579 (Fla. 3d DCA 1977).