DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SOUTH DADE DEALERSHIP, LLC** d/b/a
**SOUTH DADE TOYOTA,**
Appellant,

v.

**LINE 5 LLC** and **CARX DEPOT, LLC,**
Appellees.

No. 4D2024-2150

[April 22, 2026]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Jeffrey Richard Levenson, Judge; L.T. Case No. 062017CA005868AXXXCE.

Jeffrey VanVoorhis Mansell of Burlington & Rockenbach, P.A., West Palm Beach, for appellant.

Michael Scott Perse, Kalpesh Mehta, and Philippe E. Lieberman of Kluger, Kaplan, Silverman, Katzen & Levine, P.L., Miami, for appellee Line 5 LLC.

No appearance for appellee CarX Depot, LLC.

FORST, J.

Appellee Line 5 LLC ("Line 5") sued CarX Depot, LLC ("CarX") and obtained a default final judgment against CarX for $692,469.65. Line 5 moved to commence proceedings supplementary and implead appellant South Dade Dealership, LLC d/b/a South Dade Toyota ("South Dade") to collect on the default final judgment against CarX. After a bench trial, the trial court determined CarX and South Dade were "inextricably intertwined" and "pierced the corporate veil" on two theories of liability: alter ego and mere continuation.

South Dade raises the following three issues on appeal: (I) the trial court's veil-piercing conclusion is not supported by competent substantial evidence; (II) the trial court abused its discretion in admitting two checks into evidence that Line 5 allegedly failed to properly disclose before trial;

and, alternatively, (III) the default final judgment entered against CarX is void. We reverse the trial court's erroneous veil-piercing conclusion because CarX and South Dade were separate LLCs, with each maintaining its own independent existence. The reversal on Issue I moots South Dade's two other issues raised on appeal, which we accordingly decline to address.

## Background

When a motor vehicle dealership sells a motor vehicle to a consumer, the dealership may advertise and sell additional finance and insurance ("F&I") products to the purchaser, such as extended warranties. Line 5, which provides consumer financing for these F&I products, entered into two separate participation agreements with South Dade and CarX regarding F&I products sold by each dealership.

Boris Lopez ("Lopez"), South Dade's then-general manager, signed the participation agreement with Line 5 on South Dade's behalf. South Dade operates a Toyota dealership that sells both new and used cars. South Dade is owned by Mario Benedetti and his wife, Maria. Lopez has no ownership stake in South Dade.

Alfonso Gonzalez ("Gonzalez"), CarX's then-general manager, signed the participation agreement with Line 5 on CarX's behalf. CarX, now defunct, was a used car dealership that operated out of three Miami-Dade County locations from mid-2015 until roughly early 2017. Gonzalez was a twenty-five percent owner of CarX who reportedly left the United States after CarX's closure. Two other individuals each owned twenty-five percent of CarX. MB Holdings Investments, LLC ("MB Holdings") owned the remaining twenty-five percent of CarX, and Mario Benedetti and Lopez owned MB Holdings when CarX was operational.[1] South Dade did not own any interest in CarX or MB Holdings.

The trial testimony elaborated on the F&I product sale process, which the trial court summarized in its findings of fact. This process involved Line 5 providing money upfront to the participating dealership for an F&I product contract sale, the dealership retaining a portion once it sold an F&I product to a customer, the remainder channeling through a third-party administrator, Total Warranty Services ("TWS"), and then the remainder ultimately being deposited into a separate fund known as a warranty account.

---

[1] Maria Benedetti later acquired an interest in MB Holdings such that she, Mario Benedetti, and Lopez each became equal shareholders.

The cancellation and refund process is essentially this process in reverse, and depending on the cancellation date, the consumer's payments on the F&I product contract, and the contract expiration date, Line 5 would normally receive a full refund or a prorated portion of the amount Line 5 initially provided to the dealership.

Further, pursuant to the F&I process, the warranty account holds remainders known as "reserves" in the aggregate for F&I products sold by a dealership. The reserves are intended to pay out potential claims associated with the contracts. If reserves remain in the warranty account after the F&I contracts expire, those reserves become available to the warranty account's beneficiary as profit.

Through MB Holdings, Mario Benedetti and Lopez established a warranty account that housed the reserves for Line 5-financed F&I products sold by South Dade and CarX. This warranty account was named MB Warranty. No evidence existed that South Dade owned an interest in MB Warranty or that South Dade was a beneficiary of the MB Warranty account. Additionally, the trial testimony established that third-party administrator TWS exercised control over the funds in the MB Warranty account, which the trial court noted in its findings of fact.

Shortly after CarX signed its participation agreement with Line 5, many customers complained about Line 5-financed F&I products sold by CarX. The high number of customer complaints resulted in the cancellation of nearly all CarX F&I contracts, and Line 5 attempted to recover the funds which it had initially provided to CarX via the aforementioned refund process. Line 5 attempted to resolve the issue directly with Gonzalez at CarX, who referred Line 5 to Lopez at South Dade. A South Dade warranty clerk testified about how she handled the refund process for South Dade and CarX, and she estimated processing "maybe six or seven" CarX cancellations. Line 5 received less than ten refunds in total from CarX, which did not include the portion that CarX took upfront after Line 5 initially sent the funds. Ultimately, Line 5 was not reimbursed for $554,795 that Line 5 had initially provided to CarX for F&I products that CarX had sold to its customers.

In the same timeframe as the cancellation of CarX F&I contracts, CarX closed operations, and after Gonzalez had left the country, Lopez became responsible for "winding down the operation." Shortly after CarX's closure, Line 5 sued CarX and obtained a default final judgment for $692,469.65. Line 5 was largely unsuccessful in its collection attempts against CarX, leading Line 5 to initiate proceedings supplementary against South Dade.

Specifically, Line 5 alleged that CarX was the alter ego of South Dade or, alternatively, that South Dade was the continuation of the CarX business.

The trial evidence primarily focused on the relationship between CarX and South Dade. The evidence conflicted on the following points: 1) whether CarX leased space from South Dade for its own accounting department, or if CarX and South Dade shared accounting employees with little to no separation between the businesses; 2) whether CarX stored South Dade cars on one of CarX's lots and sold these cars, or if these cars were instead rental cars; and 3) whether South Dade approved every CarX sale because CarX sales paperwork was sent to South Dade.

Another evidentiary conflict between Line 5 and South Dade was the extent of Lopez's involvement with CarX. Lopez repeatedly testified that he was not involved in CarX's "day-to-day," and Gonzalez was instead responsible for CarX's operations. But the trial court found Lopez's involvement in CarX's operations transcended winding down its affairs. Specifically, the trial court found that Lopez "displayed for the Court a firsthand understanding of CarX operations"; was a signatory on CarX bank accounts; provided guidance to Gonzalez; attended CarX meetings; and was involved in hiring and terminating CarX employees.

An email between TWS's managing partner and Lopez was admitted into evidence revealing that TWS refunded $118,726, described as payable to CarX, directly to South Dade. The record is unclear as to what happened to these funds or how these funds were spent. The trial court found that $118,726 was sent to South Dade because CarX's accounting functions were performed at South Dade. Moreover, the trial court found CarX checks bearing a dual CarX/South Dade endorsement were deposited into CarX's operating account, and South Dade "demonstrated that each of these checks were correctly credited to the CarX operating account."

Within two months after CarX's demise, Lopez registered the fictitious name "SDT Cars" for South Dade, and roughly two months later, SDT Cars set up shop in one of the former CarX locations. SDT Cars was a short-lived used car business; Lopez testified that SDT Cars closed so he and Mario Benedetti could focus on a Kia dealership. Despite evasive testimony about the meaning of "SDT Cars," which the trial court found not credible,[2] no evidence was presented that CarX and SDT Cars had the same officers, managers, or employees. Moreover, SDT Cars had a

---

[2] Lopez denied "SDT" stood for "South Dade Toyota," but failed to offer any plausible alternative explanation.

different car inventory because CarX returned its inventory to a third party after CarX had closed.

The trial court's final judgment recognized that South Dade is not a "direct" owner of CarX, but rationalized that an alter ego theory of liability analysis could proceed "[b]ecause of [South Dade]'s inextricably intertwined business dealings with CarX Depot and MB Holdings/[South Dade] common ownership and control." The trial court concluded, based on a preponderance of the evidence, that CarX and South Dade "barely attempted to comply with the corporate formalities to keep the two entities separate."

In support, the trial court described various ways in which South Dade and CarX had conducted business with each other, including: 1) overlapping employees; 2) the "suspect" dual endorsement on checks; 3) Lopez's active involvement in the day-to-day operations of CarX; 4) South Dade approving deals made by CarX; and 5) South Dade storing new cars on a CarX lot, which CarX employees could sell.

Based on this evidence, the trial court concluded "no legitimate separation" existed between CarX and South Dade, the two entities were "inextricably intertwined," and "CarX was dominated and controlled by [South Dade], and its general manager, Boris Lopez, to the extent that its independent existence ceased."[3]

The trial court also found that SDT Cars was a "mere continuation" of CarX. In support, the trial court described how SDT Cars opened up in the former CarX locations shortly after CarX had closed, SDT Cars was a used car business, and South Dade "ostensibly overs[aw]" both dealerships. The trial court nonetheless noted that SDT Cars had a different car inventory because CarX returned its car inventory to a third party after CarX had closed.

This appeal follows.

**Analysis**

---

[3] Because we hold that the evidence was insufficient to support the trial court's alter-ego determination, we decline to address the other two veil-piercing prongs, which are: "the corporate form was used fraudulently or for an improper purpose" and "the claimant was injured as a result." *See Wurtzebach v. Flooring Depot FTL, Inc.*, 384 So. 3d 251, 254 (Fla. 4th DCA 2024) ("*Wurtzebach II*") (describing the three veil-piercing prongs).

The trial court's decision to pierce the corporate veil presents a pure issue of law, which we review de novo. *See Flooring Depot FTL, Inc. v. Wurtzebach*, 330 So. 3d 47, 49 (Fla. 4th DCA 2021) ("*Wurtzebach I*"). "The sufficiency of the evidence is an issue of law reviewed *de novo*." *Wells Fargo Bank, N.A. v. Williamson,* 199 So. 3d 1031, 1034 (Fla. 4th DCA 2016) (citation omitted). "[W]here a trial court's conclusions following a non-jury trial are based upon legal error, the standard of review is *de novo*." *Id.* (quoting *Acoustic Innovations, Inc. v. Schafer*, 976 So. 2d 1139, 1143 (Fla. 4th DCA 2008)).

Piercing the corporate veil is "a legal doctrine applied to hold a corporation's *shareholders* liable for the corporation's debts." *Wurtzebach v. Flooring Depot FTL, Inc.*, 384 So. 3d 251, 255 (Fla. 4th DCA 2024) ("*Wurtzebach II*") (emphasis added). Under Florida law, the party seeking to pierce the corporate veil has the burden of proving all three of the following factors by a preponderance of the evidence:

(1) the *shareholder* dominated the corporation to such an extent that the corporation had no independent existence, such that the *shareholder* was the alter ego of the corporation;

(2) the corporate form was used fraudulently or for an improper purpose; and

(3) the claimant was injured as a result.

*Id.* (emphasis added); *see also Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998), *rev. denied*, 727 So. 2d 903 (Fla. 1998).

### *Lack of Ownership Interest*

From the outset, this case falls outside the two common veil-piercing scenarios, which are: 1) piercing the veil between a parent company and its subsidiary to hold the parent company liable for the subsidiary's debts or actions; or 2) piercing the veil between a corporation and its owners or shareholders to hold them individually liable for the corporation's debts or actions. *See Drone Nerds Franchising, LLC v. Childress,* No. 19-CV-61153, 2021 WL 6620674, at *3 (S.D. Fla. Nov. 15, 2021), *report and recommendation adopted*, No. 19-CV-61153, 2022 WL 196306 (S.D. Fla. Jan. 21, 2022). These common scenarios are no coincidence given what the corporate veil is: a shield to immunize officers, directors, and shareholders from liability stemming from a corporation's actions. *See Corporate Veil, Black's Law Dictionary* (12th ed. 2024) ("The legal

6

assumption that the acts of a corporation are not the actions of its shareholders, so that the shareholders are exempt from liability for the corporation's actions."); *Piercing the Corporate Veil, Black's Law Dictionary* (12th ed. 2024) ("The judicial imposition of personal liability on otherwise immune corporate officers, directors, or shareholders for the corporation's wrongful acts.").

In the instant case, no dispute exists that South Dade had no ownership interest in CarX, so no parent-subsidiary relationship exists here. And Line 5 did not move to commence proceedings supplementary against any individuals affiliated with CarX or involved in its formation, such as Lopez, Mario Benedetti, or Gonzalez. Instead, Line 5 moved to commence proceedings supplementary and to implead *only* South Dade—an entity with no ownership interest in CarX, and whose ownership structure has more dissimilarities to CarX's ownership than similarities. Specifically, at the time, the only ownership overlap was through Mario Benedetti—a partial direct owner of South Dade and a partial indirect owner of CarX through MB Holdings.

Accordingly, for guidance, we turn to the few cases in which the corporate veil was pierced absent overlapping ownership. But these limited exceptional cases are distinguishable from the facts here because these cases pertain to either: 1) a non-profit corporation, which by its corporate structure did not have shareholders, *see Barineau v. Barineau*, 662 So. 2d 1008, 1009 (Fla. 1st DCA 1995), or 2) a family exception, wherein the corporate shares were in the name of a spouse or a family member of the individual financially responsible after the corporate veil was pierced. *See Walton v. Tomax Corp.*, 632 So. 2d 178, 179–81 (Fla. 5th DCA 1994); *In re Charnock*, 97 B.R. 619, 627–28 (Bankr. M.D. Fla. 1989). Here, neither CarX nor South Dade was a non-profit corporation, nor was any family dynamic at play that supported veil-piercing to a *separately-owned* entity. *See Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1350 (11th Cir. 2011) ("[A] wife's ownership is a very close analogue to the husband's ownership because the economic proceeds likely benefit the entire family unit. *A separate corporate entity is nothing like a spouse.*" (emphasis added)).

### *South Dade and CarX Were Separately Maintained*

Lack of ownership aside, we are not persuaded by the trial court's "inextricably-intertwined" analysis resulting in its conclusion that South Dade was CarX's alter ego such that South Dade should be financially responsible to Line 5 for CarX's debt. While we understand, and defer to, the trial court's skepticism toward Lopez's testimony, which the trial court

was free to afford less weight, other (undisputed) evidence establishes that CarX and South Dade maintained independent existence, and thus the trial court's decision to pierce the corporate veil was erroneous. *See PAJ Inv. Grp., LLC v. El Lago N.W. 7th Condo. Ass'n, Inc.*, 405 So. 3d 401, 410 n.4 (Fla. 3d DCA 2024) ("[E]ven if a corporation is merely an alter ego of *its dominant shareholder or shareholders*, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained." (emphasis added) (citation omitted)).

Specifically, Line 5 entered into separate participation agreements with South Dade and CarX, which Lopez and Gonzalez signed, respectively. CarX operated out of three Miami-Dade County locations and sold used cars. CarX independently held finance meetings, and Gonzalez served as CarX's general manager. Additionally, CarX had a separate bank account and the trial court noted that checks bearing a dual CarX/South Dade endorsement were "correctly credited to the CarX operating account." These facts do not support the notion that CarX failed to operate independently from South Dade. *Cf. 17315 Collins Ave., LLC v. Fortune Dev. Sales Corp.*, 34 So. 3d 166, 168 (Fla. 3d DCA 2010) ("[T]he record supports the determination that the two companies operated as alter egos. The actual owner, developer, and operating entity was [subsidiary]. [Parent] owns the membership interests of [subsidiary] and is the managing member. [Parent] does not, however, conduct any operations, have any employees or payroll, or have any bank accounts."); *USP Real Est. Inv. Tr. v. Disc. Auto Parts, Inc.*, 570 So. 2d 386, 392–93 (Fla. 1st DCA 1990) (subsidiary was deemed to be the alter ego of its parent where the subsidiary "never operated as a bona fide corporation" and "never opened a bank account or had any funds of its own").

The trial court also found it noteworthy that South Dade provided "essential staff" to CarX. But even commonalities in officers, directors, employees, and facilities will not necessarily provide a basis to disregard the corporate form and pierce the corporate veil. *See Hilton Oil Transp. v. Oil Transp. Co., S.A.*, 659 So. 2d 1141, 1152 (Fla. 3d DCA 1995) (concluding insufficient competent substantial evidence existed to disregard the corporate form, even though several corporate entities had "overlapping owners, officers and/or directors" and "shared the same office, address, and telephone number").

We are also not convinced that Lopez's involvement in CarX's operations can be imputed to separately-owned South Dade rather than MB Holdings—the entity with ownership ties to CarX, and a distinct entity from South Dade. *See Dewberry Grp., Inc. v. Dewberry Eng'rs Inc.*, 604 U.S. 321, 327 (2025) ("'[I]t is long settled as a matter of American corporate

8

law that separately incorporated organizations are separate legal units with distinct legal rights and obligations.' And that is so even if the entities are affiliated . . . ." (citation omitted)). Here, no dispute existed that Lopez was an indirect owner of CarX through MB Holdings. In fact, the trial court specifically found, "Lopez claimed MB Holdings was merely a 'passive' investor in CarX Depot and that Gonzalez alone was responsible for the day-to-day operations. However, the record demonstrates otherwise. Firstly, MB Holdings is designated as a managing member of CarX Depot, and Lopez is a managing member of MB Holdings." This ownership quotation is devoid of any reference to South Dade, and instead suggests that *MB Holdings* had a heightened involvement in CarX's operations.

Indeed, the trial evidence showed that *MB Holdings* was responsible for creating MB Warranty—the warranty fund that housed the reserves for Line 5-financed F&I products sold by CarX and South Dade. No evidence was presented that South Dade was involved in MB Warranty's formation, exercised control over the account, or was a beneficiary. Instead, the trial court found third party TWS exercised control over the MB Warranty fund. Also, the record is unclear regarding what happened to the $118,726 made payable to CarX that TWS sent to South Dade. In fact, the trial court noted that CarX's accounting functions were performed at South Dade, notwithstanding evidentiary conflicts regarding whether these functions were performed in a separate CarX accounting department or by employees shared between CarX and South Dade.

Based on the foregoing, competent substantial evidence does not support the trial court's determination that South Dade was the alter ego of CarX and "dominated and controlled" CarX such that CarX's "independent existence ceased." While CarX and South Dade were "intertwined," they were not so intertwined that their separate corporate forms were disregarded. Accordingly, the trial court erred in piercing the corporate veil on an alter ego theory.

### *Mere Continuation*

The trial court similarly erred when it found South Dade was the mere continuation of CarX via the creation of SDT Cars. "The concept of alter ego or continuation of business 'arises where the successor corporation is merely a continuation or reincarnation of the predecessor corporation under a different name.'" *Longo v. Associated Limousine Servs., Inc.*, 236 So. 3d 1115, 1120 (Fla. 4th DCA 2018) (quoting *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 154 (Fla. 4th DCA 1994)). "The bottom-line question is whether each entity has run its own race, or whether there has

9

been a relay-style passing of the baton from one to the other." *Longo*, 236 So. 3d at 1120–21 (quoting *Orlando Light Bulb Serv., Inc. v. Laser Lighting & Elec. Supply, Inc.*, 523 So. 2d 740, 742 n.1 (Fla. 5th DCA 1988)). "The key element of a continuation is a common identity of the officers, directors and stockholders in the selling and purchasing corporation. The change is in form, but not in substance." *Azar*, 648 So. 2d at 154.

The referenced key element is absent here. Lopez registered the fictitious name "SDT Cars" for South Dade within two months after CarX had closed. But as discussed previously, CarX and South Dade had different owners, and the sole ownership overlap was indirectly through Mario Benedetti. No evidence established that SDT Cars utilized the same CarX staff or managers. In fact, little evidence was presented about the SDT Cars business itself, except that it was short-lived so Mario Benedetti and Lopez could focus on a different dealership. The trial court simply stated that CarX and SDT Cars were "ostensibly overseen" by South Dade.

While SDT Cars opened up in a former CarX location, the trial court also found SDT Cars had a different car inventory because CarX returned its inventory after CarX had closed. We do not see competent substantial evidence of a relay-style passing of the baton here to support veil-piercing under a mere continuation theory. *Cf. Azar*, 648 So. 2d at 154 ("The old P.A. ceased rendering medical services shortly after the judgment was entered against it. The next day the baton was passed to the new P.A. which commenced full operations. It provided the same type of medical services in the same office with the same files, patients, nurses, clerical help, office manager and the same major player, Dr. Munim—the sole stockholder in and president of each P.A."). Accordingly, the trial court erred in piercing the corporate veil on a mere continuation theory.

## Conclusion

"[C]ourts are generally reluctant to pierce the corporate veil and will do so only in exceptional cases." *Eagle v. Benefield-Chappell, Inc.*, 476 So. 2d 716, 719 (Fla. 4th DCA 1985). Here, because the trial court erred when it pierced the corporate veil under alter ego and mere continuation theories to hold South Dade responsible for CarX's debt owed to Line 5, we reverse and remand for the trial court to enter final judgment in South Dade's favor.

*Reversed and remanded with instructions.*

KUNTZ, C.J., and SHEPHERD, J., concur.

\*          \*          \*

*Not final until disposition of timely-filed motion for rehearing.*