RESOLUTION TRUST CORPORATION, as conservator and/or receiver of Centrust Savings Bank; Columbia Savings & Loan Association; Farwest Savings & Loan Association; Franklin Savings & Loan Association; and/or in its corporate capacity, Plaintiff,

v.

LATHAM & WATKINS and Robert J. Rosenberg, Defendants.

RESOLUTION TRUST CORPORATION, as receiver of Farwest Savings and Loan Association, F.A., and Columbia Savings and Loan Association, F.A., and as assignee of American Capital Fidelity Corporation and Liberty Service Corporation, Plaintiff,

v.

LATHAM & WATKINS and Robert J. Rosenberg, Defendants.

Nos. 93 Civ. 4364 (MBM), 94 Civ. 1460 (MBM).

United States District Court, S.D. New York.

Dec. 27, 1995.

William F. Duker, George F. Carpinello, Duker & Barrett, New York City, Michael I. Endler, Resolution Trust Corporation, Washington, DC, for plaintiffs.

Leon Silverman, Michael H. Rauch, Debra Torres, David McMillin, Michael F. Colosi, Stephanie J. Goldstein, Fried Frank Harris Shriver & Jacobson, New York City, for defendants.

MUKASEY, District Judge.

Plaintiff Resolution Trust Corporation ("RTC"), on behalf of four failed thrift institutions, has sued the law firm of Latham & Watkins and one of its partners for securities fraud under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1994), and state law. Defendants move for summary judgment under Fed.R.Civ.P. 56 on all remaining claims in both of the above-captioned actions. For the reasons set forth below, the motion is granted, and the complaints are dismissed.

## I.

The facts are essentially undisputed. Defendant Latham & Watkins ("Latham") is a California-based law firm. (Am.Compl. ¶ 27) Defendant Robert J. Rosenberg is a partner at Latham's New York City office who directed the firm's work on the transaction at issue here. (Id. ¶ 28) In 1988, Latham issued an opinion letter in connection with the leveraged buyout ("LBO") of the Jim Walter Corporation ("JWC") by Hillsborough Holdings Corporation ("Hillsborough").

### A. The Leveraged Buy–Out and the Latham Opinion Letter

Prior to the LBO, JWC was a Florida holding company which, through its subsidiaries, engaged in a variety of construction-related businesses. (Id. ¶ 29) One of JWC's subsidiaries was the Celotex Corporation ("Celotex"), a manufacturer of building products including insulation, roofing supplies, and plumbing fixtures, some containing asbestos. (Id. ¶¶ 31–32) Beginning in the late 1960's, Celotex became the target of thousands of personal injury and wrongful death lawsuits arising from asbestos exposure. (Id. ¶ 33)

In 1987, the investment banking firm Kohlberg Kravis Roberts & Company ("KKR") launched a friendly takeover bid for JWC and formed Hillsborough as an acquisition vehicle. (Id. ¶¶ 37–39) To fund part of a $2.44 billion tender offer for the outstanding securities of JWC, Hillsborough planned to issue high-yield debt instruments—known popularly as "junk" bonds—and common stock. These securities were slated for purchase by institutional investors in a private placement. (Id. ¶¶ 64, 79, 82, 87)

To convince investors to purchase the securities, it was necessary to establish that Celotex's potential liability on asbestos claims could not reach JWC or any entity into which JWC would merge. To that end, KKR and its accountants, Deloitte Haskins & Sells ("Deloitte"), asked Latham to draft an opinion letter assessing the likelihood that a court might "pierce the corporate veil" of Celotex and hold JWC liable for damages in an asbestos suit. (Id. ¶ 69) Latham prepared two substantively identical letters on this topic. The first, dated September 18, 1987, was appended to a solvency report delivered by Deloitte to Hillsborough and banks financing the LBO. The second (the "Opinion"), dated January 7, 1988, was distributed to purchasers of the Hillsborough securities and is the focus of this suit. (Id. ¶¶ 83, 88–90; McMillin Decl.Ex. D)

The Opinion was written "solely for the purpose of analyzing the likelihood of success on the merits of a claim against [JWC] based on an 'alter ego' theory ... for the manufacture and sale of asbestos-related products by [Celotex]." (Opinion at 1) Based upon an examination of JWC records and Florida law, Latham concluded:

> [W]e are of the opinion that, if a claim were to be asserted against [JWC] for

damages allegedly deriving from the manufacture and sale of asbestos-related products by Celotex, the probability of an outcome unfavorable to [JWC] is slight.

(*Id.* at 2)

Latham cautioned that this conclusion was subject to numerous "limitations and qualifications." (*Id.*) First, Latham "express[ed] no opinion concerning the likelihood of alter ego claims being asserted against [JWC], or . . . the likelihood of [JWC's] successful prosecution of a motion for summary judgment with respect to such claims." (*Id.*) Second, Latham assumed for purposes of the Opinion that Florida law would govern a veil piercing claim against JWC, but advised that "choice of law principles could result in the application of the laws of a state other than Florida." (*Id.* at 2–3) Latham accordingly stressed that its conclusion was "based solely upon . . . case law precedents in Florida. . . ." (*Id.* at 1) Finally, Latham explained that the firm expressed no opinion as to Celotex's own potential liability on asbestos-related tort claims. (*Id.*)

**B. *The Celotex "Spin–Off," the Celotex and Hillsborough Bankruptcy Filings, and the Commencement of this Action***

The LBO was consummated on January 7, 1988 with the aid of short-term commercial bank financing and was followed by the first in a series of Hillsborough bond closings. At each closing, a copy of the Opinion was tendered to each bond purchaser as part of a package of closing documents. (Am.Compl. ¶ 92) Among the bond purchasers were the savings and loan associations to whose rights plaintiff RTC has acceded. (*Id.* ¶¶ 20–26) Concurrently, through a complicated series of transactions, JWC was merged into Hillsborough, and most of the former JWC subsidiaries became subsidiaries of Hillsborough. (*Id.* ¶ 101) Meanwhile, a "new" JWC was created whose holdings included only Celotex. (*Id.* ¶ 102) The "new" JWC was transferred in April 1988 to the Jasper Corporation ("Jasper") along with Apache Building Products, another former subsidiary of the "old" JWC. The deal was structured so that Hillsborough actually paid Jasper nearly

$50 million to take the "new" JWC off its hands. (*Id.* ¶ 102–103)

On October 12, 1990, Celotex filed for bankruptcy protection. On that date, over 140,000 asbestos lawsuits were pending against the company. (*Id.* ¶¶ 104–105) Many of the asbestos claimants, in search of alternative sources of recovery, had asserted veil piercing claims against Hillsborough. By 1990, over 2,000 such claims were pending in lawsuits around the country. (*Id.* ¶ 105) The most significant veil piercing claim was in an action that had been filed on July 13, 1989 in a Texas state court. *Larned v. Kohlberg, Kravis, Roberts & Co.* (Tex.Dist.Ct., Jefferson County, 60th Judicial Dist., No. B–133554). (*Id.* ¶ 106) The *Larned* plaintiffs purported to represent a nationwide class of 80,000 asbestos victims, although the court apparently never certified the lawsuit as a class action. (Koob Decl., July 8, 1994, ¶ 4)

Before the filing of the *Larned* action, Hillsborough had been selling off former JWC subsidiaries to pay debt incurred in the LBO. (Am.Compl. ¶ 108) After *Larned* was filed, Hillsborough agreed—under threat of an injunction—to cease those asset sales. Meanwhile, negotiations between Hillsborough and commercial lenders for additional financing broke down, and the value of the Hillsborough securities plummeted. (*Id.* ¶ 110–111) On December 27, 1989, with default looming, Hillsborough filed for bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida. (*Id.* ¶ 116)

Plaintiff RTC claims losses exceeding $43 million on the Hillsborough securities purchased by the failed thrift institutions. (*Id.* ¶ 119) On June 28, 1993, the RTC filed the first of the above-captioned cases, No. 93 Civ. 4364. In its initial complaint, the RTC alleged securities fraud under federal and state law, negligent misrepresentation, and a third-party beneficiary claim. On December 2, 1993, I dismissed the negligent misrepresentation and third-party beneficiary claims in a ruling from the bench. In an amended complaint filed January 6, 1994, the RTC reasserted the securities fraud claims under Rule 10b–5, 17 C.F.R. § 240.10b–5 (1995),

New York common law, and Cal.Civ.Code §§ 1709–1710 (West 1995).

## C. *The Bankruptcy Court Decision and the Hillsborough Reorganization Plan*

Meanwhile, in the Hillsborough bankruptcy case, Hillsborough moved for a declaratory judgment that the JWC/Celotex corporate veil could not be pierced. Hillsborough's complaint named Celotex and the asbestos claimants as defendants. In August 1992, Hillsborough's motion for partial summary judgment was denied. *In re Hillsborough Holdings Corp.*, 144 B.R. 913, 919 (Bankr. M.D.Fla.1992). On April 18, 1994, the Bankruptcy Court ruled in favor of Hillsborough after a trial on the merits. *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 475–76 (Bankr.M.D.Fla.1994).

As a threshold matter, the Bankruptcy Court applied Florida choice of law principles, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), and determined that either Florida or Delaware law governed the veil piercing claims because JWC and Celotex were Florida and Delaware corporations, respectively, and both companies maintained headquarters in Florida. 166 B.R. at 468. The veil piercing law in these two jurisdictions, the Court found, was "functionally the same": courts in both Delaware and Florida pierce the corporate veil only upon "proof of *deliberate* misuse of the corporate form— tantamount to fraud." *Id.* at 469 (emphasis in original). Moreover, the Court noted, Florida requires a showing of "improper conduct"; that is, the claimant must establish that the corporate form was a "mere device or sham" or was deliberately used to accomplish "some fraud or illegal purpose." *Id.* (citations omitted) The Court found the evidence insufficient to support such a finding.

First, the Court considered the cash management system utilized by JWC and Celotex. Under this system, payments owed to Celotex were deposited directly into central accounts controlled by JWC. The asbestos claimants had argued that this proved that JWC excessively manipulated Celotex's cash flows. The Court disagreed, finding that this accounting system was "totally consistent with sound business practices." *Id.* at 471. Similarly, the Court found that centralized record-keeping and the assessment of a fee by JWC for services rendered to Celotex were standard business practices that did not suggest abuse of the corporate form. *Id.* at 471–72.

Second, the Court examined corporate governance. The Court noted that several members of the JWC board of directors also sat on the Celotex board and that Celotex needed approval from JWC for capital expenditures, acquisitions, and sales of capital assets. Nevertheless, the Court found that Celotex controlled its own day-to-day operations and that JWC's involvement as parent and 100% owner of Celotex was "within the accepted standards of the corporate business world." *Id.* at 472.

Third, the Court considered accusations by the asbestos claimants that JWC improperly caused Celotex to sell off its subsidiaries in anticipation of asbestos-related liability. The proceeds from these sales had been used, in part, to pay down loans from JWC to Celotex. The Court determined that

[t]here is no hard evidence in this record which would warrant the conclusion ... that JWC embarked upon conduct using its dominating position as a parent to liquidate the assets of Celotex specifically for the purpose of evading any possible liability resulting from the asbestos litigation.

*Id.* at 473. The asset sales were attributable, in the Court's view, to JWC's liquidity needs and to the historically poor performance of the subsidiaries that were sold off. *Id.* The Court found no evidence that the intercompany loans were anything other than legitimate obligations. *Id.* at 473–75.

The Court, straining harder for a metaphor than the result warranted, concluded that the asbestos claimants' proof was a "slender reed, indeed, upon which to hang a sword with sufficient strength required under the law to pierce the corporate veil," *id.* at 475–76, and entered judgment in favor of Hillsborough.

Celotex and the asbestos claimants appealed this decision to the United States District Court for the Middle District of Florida. In

an opinion issued October 13, 1994, the District Court affirmed. The District Court stressed that the defendants in the declaratory judgment action had "failed to establish the improper conduct element of their veil-piercing claim." *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 254 (M.D.Fla.1994). A month later, the asbestos claimants filed an appeal to the United States Court of Appeals for the Eleventh Circuit.

After the appeal was filed, the parties to the bankruptcy action agreed to a plan of reorganization for Hillsborough. The plan included a settlement agreement between Hillsborough and the asbestos plaintiffs requiring Hillsborough to pay $375 million into a fund for all present and future claimants. (McMillin Decl.Ex. M at 151–67, Ex. N at 77) Pursuant to this agreement, the appeal was dismissed by stipulation. (*Id.* Ex. L)

In an order issued March 2, 1995, the Bankruptcy Court approved the Hillsborough reorganization plan and the settlement agreement. The Court acknowledged that Hillsborough was paying a substantial sum to settle a claim that had been adjudged meritless by two courts, but reasoned that "[n]otwithstanding the Debtors' probability of success on the merits, the Debtors have sound business reasons for eliminating the threat of future litigations." (McMillin Decl.Ex. N at 31) As part of its confirmation order, the Court permanently enjoined the prosecution of all actions seeking to pierce the JWC/Celotex corporate veil. (*Id.* at 77–79) Hillsborough emerged from bankruptcy on March 17, 1995. Latham and Rosenberg moved for summary judgment in the present action on June 30, 1995.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rule 10b–5 provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1995). To recover under Rule 10b–5, a plaintiff must prove: (1) a false or misleading statement or omission, (2) scienter or recklessness, (3) reliance, and (4) loss causation. *Citibank, N.A. v. K–H Corporation*, 968 F.2d 1489, 1494–95 (2d Cir. 1992).

## III.

As to the first of the four elements, to establish liability, the RTC must prove the deceptively simple proposition that Latham initially said something materially false in the Opinion or omitted information necessary to make the Opinion not misleading.

## A.

Intuitively, it seems peculiar to premise liability for a false statement on a prediction that turned out to be accurate. In 1988, Latham predicted that the likelihood of the successful prosecution of a veil piercing claim against JWC was "slight." In April 1994, the first court to reach the merits of the issue rebuffed an attempt to pierce the JWC/Celotex corporate veil, and its decision later was affirmed by a federal district court. Under the Hillsborough bankruptcy reorganization plan, all veil piercing claims against JWC arising from Celotex's asbestos liability have been permanently enjoined. It is now clear that the JWC/Celotex corporate veil will never be pierced.

Actually, the Bankruptcy Court's ruling does not make it impossible for the RTC to show that the statements in the Opinion were knowingly false. Even though Latham's prediction of a "slight" likelihood of veil piercing was consistent with what actually happened in later litigation, the prediction nevertheless may have been fraudulently optimistic given the law and facts as they existed at the time the prediction was made. It might be that (1) in 1988 there was an objectively substantial probability that the JWC/Celotex corporate veil would be pierced, (2) that Latham

ignored the facts and the law and cavalierly underestimated this probability, and (3) that Latham's prediction turned out to be "on the mark" wholly by accident. Similarly, if the Bankruptcy Court had declared that the JWC/Celotex corporate veil could be pierced, Latham's Opinion still might not have been fraudulent. The point is that although later legal rulings are helpful to the analysis of the underlying law, the real issue is the accuracy of the Opinion at the time Latham issued it.

## B.

If Latham—or anyone—had promised in 1988 that "Hillsborough securities are a risk-free investment," it would be easy to demonstrate that this statement was so irresponsibly optimistic as to be fraudulent. This assertion properly could be deemed fraudulent simply because it ignores risks known to be inherent in financial markets in general and in the "junk bond" market in particular.

But the Latham Opinion said nothing near that. Latham did not evaluate whether Hillsborough securities were a wise investment. Latham did not opine on the general soundness of the Hillsborough business enterprise or on the future ability of Hillsborough to service its debt. Instead, Latham addressed a single narrowly-framed issue: what is the probability of the success on the merits of a veil piercing claim asserted under Florida law against JWC by asbestos claimants?

Answering this question, Latham spoke with an extreme caution typical of law firm opinion letters. The four-page 1988 letter contained only one sentence that actually asserted an opinion; the rest of the letter qualified and limited that opinion. In the presence of such cautionary language, courts generally are reluctant to find fraud. *See, e.g., In re Donald J. Trump Casino Secs. Litig.,* 7 F.3d 357, 371 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) ("cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law"); *I. Meyer Pincus & Assoc. v. Oppen-*

*heimer & Co.,* 936 F.2d 759, 763 (2d Cir.1991) (courts will not impose liability on the basis of statements that "bespeak caution").

The RTC alleges that the Opinion was materially false or misleading in several respects. (Am.Compl. ¶ 94) Each allegation fails to establish fraud because the RTC either (1) cannot establish that Latham misapplied or misunderstood Florida veil piercing law, (2) misstates the content of the Opinion, or (3) misconstrues the scope of Latham's duty to speak.

### (i) *Latham's Objectivity*

■ The RTC's first allegation of falsity in the Opinion relates not to veil piercing law or to the Hillsborough securities but to Latham's professed role in the LBO. The RTC argues that Latham falsely "created an impression that the opinion ... was an objective one, rendered by a disinterested, independent law firm...." (Am.Compl. ¶ 94(a)) The RTC stretches the bland introductory statement of the Opinion—that the firm had been retained to opine on veil piercing—into an assurance about Latham's objectivity. But even if Latham misrepresented its own objectivity, it is difficult to imagine how the actual losses the RTC's predecessors suffered on the securities could have been caused by that statement. That statement could not give rise to liability under Rule 10b–5 because Latham's objectivity, or lack thereof, had no material bearing on the value of the securities or the truth of the assertions in the Opinion.

### (ii) *Undercapitalization and Excessive Domination*

■ Second, the RTC claims that Latham's assessment that there was only a "slight" probability of an unfavorable outcome in a veil piercing suit was knowingly false. In a reprise of the arguments unsuccessfully advanced by the asbestos claimants in the bankruptcy action, the RTC contends that JWC disregarded Celotex's corporate separateness [1] and left Celotex undercapital-

---

1. *See, e.g.,* Am.Compl. ¶ 94(c): "[Defendants] knew ... and omitted from the Letter, the facts of JWC's total dominance and control over the affairs of Celotex ... including, total control over (1) Celotex's board of directors; (2) Celotex's administration; (3) the hiring and firing of its

ized.[2] (Am.Compl. ¶ 94(b)–(d)) These facts, the RTC maintains, should have made it clear to Latham that JWC was peculiarly vulnerable to a veil piercing claim under Florida law.

The leading case on veil piercing under Florida law is *Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla.1984). In *Dania,* a patron sued the operator of an entertainment center for personal injuries sustained in a car accident in a parking lot adjacent to the center. The parking lot and entertainment center were operated by separate corporations owned by the same parent company. The trial court and intermediate appellate court found that "there was no wrongdoing or fraud" in this corporate structure, yet found all three corporations liable for damages on the theory that the two subsidiaries were "mere instrumentalities" of the parent. The Florida Supreme Court reversed.

"The corporate veil will not be penetrated," the Court held, "unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud on them." *Id.* at 1120 (quoting *Advertects, Inc. v. Sawyer Indus., Inc.,* 84 So.2d 21, 23 (Fla. 1955)). The Court explained that a claimant must produce evidence of "improper conduct," that is, "some illegal, fraudulent or other unjust purpose." *Id.* at 1121 (quoting *Roberts' Fish Farm v. Spencer,* 153 So.2d 718, 721 (Fla.1963)).

The *Dania* case and its strict "improper conduct" requirement exemplify the "somewhat conservative character of Florida veil-piercing jurisprudence." *See* Stephen B.

Presser, *Piercing the Corporate Veil* § 2.10 (1995); Elizabeth D. Clark, *Piercing the Corporate Veil in Florida: The Requirement of "Improper" Conduct,* 16 Stetson L.Rev. 60, 108 (1986) (hereinafter "Clark") (*Dania* "reaffirms the long standing hesitancy of courts in Florida to disregard the corporate entity"); Note, *Piercing the Veil of Limited Liability Companies,* 62 Geo.Wash.L.Rev. 1143, 1158 n. 114 (1994). Plaintiffs who would pierce the corporate veil bear a heavy burden of proof under Florida law. *See, e.g., Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 43 F.3d 1054, 1064 (6th Cir. 1995)[3] ("As is true in most jurisdictions, Florida law holds that courts should generally be reluctant to pierce the corporate veil"), *cert. denied,* —— U.S. ——, 116 S.Ct. 296, 133 L.Ed.2d 203 (1995); *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.,* 792 F.Supp. 1566, 1576 n. 7 (S.D.Fla.1992) (same); *Roberts' Fish Farm,* 153 So.2d at 721 (same); *Acquisition Corp. of America v. American Cast Iron Pipe Co.,* 543 So.2d 878, 882 (Fla.Dist.Ct.App.1989) (same); *Eagle v. Benefield–Chappell, Inc.,* 476 So.2d 716, 719 (Fla.Dist.Ct.App.1985) (Florida courts will pierce the corporate veil "only in exceptional cases"); Presser, *supra,* § 2.10 ("Florida courts, like those of many other jurisdictions, regard veil-piercing as an extraordinary remedy, to be exercised with caution").

After *Dania,* Florida courts have pierced the corporate veil only in extreme cases of abuse of the corporate form. In *USP Real Estate Inv. Trust v. Discount Auto Parts, Inc.,* 570 So.2d 386 (Fla.Dist.Ct.App.1990), for example, a corporation created a subsid-

---

officers; (4) Celotex's handling of the asbestos-related health risks and the ensuing litigation; (5) when Celotex would buy or sell assets, when it would borrow money and when it would pay it back, and (6) when it would upstream funds to its parent JWC."

**2.** *See, e.g., id.* ¶ 94(d): "[Defendants] knew ... and omitted from the Letter, that they had in their possession historical data and independent appraisals demonstrating that Celotex's asbestos related liability far exceeded its assets, that Celotex would face substantially more asbestos claims in coming years, that Celotex's insurance coverage would be depleted within three to five years, and that Celotex would be bankrupt within the same period of time."

**3.** Of course, *Becherer* was decided in 1995 and did not exist in 1988 when Latham issued the Opinion. But *Becherer* and the other post–1988 cases cited in this opinion are consistent with pre–1988 authority, as the citations collected herein illustrate. Like the cases issued before 1988, the post–1988 cases all rely heavily on the seminal 1984 decision of the Florida Supreme Court in *Dania.* It cannot seriously be argued that it was significantly easier to pierce the corporate veil in Florida in 1988 than it was after 1988; there have been no major shifts in Florida veil piercing law since *Dania.* The post–1988 cases merely provide further evidence of long-standing tendencies, because they continue the pre–1988 jurisprudential trajectory along the same arc.

iary solely to hold the lease to premises occupied by the corporation's retail auto parts business. The Court determined that veil piercing was appropriate only after finding that

> [the subsidiary] was never operated as a bona fide business; its capital stock was never paid; it never had any assets other than the assigned lease; it never opened a bank account or had any funds of its own ...; it never had any employees ...; it had no income and never recorded any financial transactions ... and it simply had no business purpose other than to act as an insulating entity between [the corporation], as the real operating arm of the business, and the landlord....

*Id.* at 392. *See also Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.,* 833 F.2d 1484, 1486 (11th Cir.1987) (piercing corporate veil where corporation was a "sham"; records showed "no meetings or actions by the corporation other than its initial organizational meeting"). Similarly, the Court in *In re C.W. Bailey,* 124 B.R. 348 (M.D.Fla.1991), pierced the veil of a corporation that was organized to carry on a cattle business that had been shut down by order of the Department of Agriculture. The shareholders' knowing defiance of the government order, the Court held, demonstrated that the corporation "was formed and operated for an illegal purpose." *Id.* at 351.

In *Resorts Int'l, Inc. v. Charter Air Center, Inc.,* 503 So.2d 1293 (Fla.Dist.Ct.App. 1987), a casino engaged in extensive contract negotiations concerning transportation services with a small airline company. Moments before the contract was signed, a casino official informed representatives of the airline that a subsidiary entity of the casino would be substituted as the named party in the contract as a "mere formality." This intentional effort to mislead, the Court held, was sufficient to establish "improper conduct." *Id.* at 1295.

Absent proof of intentionally fraudulent conduct, courts simply do not pierce the corporate veil under Florida law. In *Hilton Oil Transp. v. Oil Transp. Co.,* 659 So.2d 1141 (Fla.Dist.Ct.App.1995), for example, the Court deemed it insufficient that a share-

holder operated a wholly-owned corporation in a "loose and haphazard manner." *Id.* at 1152. The Court acknowledged (1) that the wholly owned corporation did not observe corporate formalities, (2) that the corporation had no capitalization and owned a small boat as its lone asset, and (3) that the sole shareholder exercised complete control over the corporation's board of directors. Nevertheless, this did not establish "improper conduct" because the claimant did not show that the corporation "was either organized for or being used as an instrument for fraudulent, illegal, or improper purposes." *Id.* at 1153. *See also U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1043 (9th Cir.1986) ("*[Dania]* makes clear that a necessary predicate for an alter ego finding is fraudulent or misleading conduct *directed at creditors*") (emphasis in original); *Ally v. Naim,* 581 So.2d 961, 963 (Fla.Dist.Ct.App.1991) ("It is not enough to show that the corporation's business affairs had been rather poorly handled"; claimant must show that shareholders "fraudulently or inequitably abused their relationship with the corporate entity") (citation omitted); Lesley L. Cooney, *Business Associations: 1992 Survey of Florida Law,* 17 Nova.L.J. 7 (1992) (Florida courts have interpreted *Dania* to require intentional fraud); Clark at 108 ("Florida courts ... have sometimes exhibited a high degree of tolerance for unusual and irresponsible business activities designed to benefit the shareholders at the expense of the creditors"). In another case, *111 Properties, Inc. v. Lassiter,* 605 So.2d 123 (Fla.Dist. Ct.App.1992), an individual formed a corporation to purchase a parcel of real property because the owner of the property disliked the individual and would not knowingly sell to him. *Id.* at 124. The Court agreed with the claimant that the individual's conduct was a "subterfuge" to conceal his identity, but held that this was "not an example of the kind of conduct the supreme court in *Dania Jai–Alai Palace* describes as sufficient to pierce the corporate veil." *Id.* at 126.

The RTC alleges that Latham knew "JWC had removed over $425 million from Celotex during a time period when Celotex's liabilities greatly exceeded its assets." (Am. Compl. ¶ 94(b)) As the Bankruptcy Court and

District Court recognized, this simply is not enough to establish "improper conduct." Under *Dania*, a veil piercing plaintiff would have to show that JWC removed the assets with an intent to defraud Celotex's creditors. The asbestos claimants were unable to produce evidence supporting this essential element of a veil piercing claim. If there is evidence of intentional fraud that managed to elude Latham, the asbestos claimants, and both courts in the bankruptcy action, the RTC has not directed this court's attention to it.

If a parent corporation suddenly liquidates a subsidiary's entire asset portfolio as a debt of the subsidiary is about to come due, the timing and magnitude of the transaction might raise suspicions sufficient to establish "improper conduct." But this is not such a case. The asset sales identified by the RTC occurred gradually over a six-year period, and coincided with a decline in the real estate market that impaired JWC's liquidity. This evidence is inconclusive at best. Because Florida courts never presume fraud for purposes of finding "improper conduct," *Reina v. Gingerale Corp.*, 472 So.2d 530, 531 (Fla. Dist.Ct.App.1985), the asset sales would not justify piercing the corporate veil of Celotex under the rule of *Dania.*

The evidence cited by the RTC as support for the "excessive domination" argument is similarly deficient. Under Florida law, "[t]he mere fact that one or two individuals own and control the stock structure of a corporation does not lead inevitably to the conclusion that the corporate entity is a fraud or that it is necessarily the alter ego of its stockholders...." *Dania*, 450 So.2d at 1120 (quoting *Advertects*, 84 So.2d at 23–24). As the cases following *Dania* uniformly have recognized, proof of domination and control, alone, does not establish "improper conduct." *Barkett v. Hardy*, 571 So.2d 13, 14 (Fla.Dist. Ct.App.1990); *Acquisition Corp.*, 543 So.2d at 881–82 ("The corporate veil may not be pierced unless it is shown not only that one business entity dominated or was the alter ego of the other, but that the relationship was created or used in order to mislead or defraud investors"); *Steinhardt v. Banks*, 511 So.2d 336, 339 (Fla.Dist.Ct.App.), *review*

*denied,* 518 So.2d 1273 (1987); *Hester v. Tucker*, 465 So.2d 1261, 1262 (Fla.Dist.Ct. App.) (refusing to pierce corporate veil even though sole shareholder micromanaged corporation; plaintiff failed to establish intentional fraud), *review denied,* 476 So.2d 674 (1985).

The RTC charges also that Latham knew Celotex was undercapitalized and underinsured. Again, the RTC fails to appreciate the significance of the *Dania* "improper conduct" requirement. Absent proof of a deliberate attempt to deceive creditors, Florida courts will not pierce the corporate veil on the basis of undercapitalization. *Becherer,* 43 F.3d at 1064 (thin capitalization, alone, does not provide a basis for piercing the corporate veil under Florida law; claimant must prove that a shareholder intentionally concealed the corporation's thin capitalization or defrauded or misled investors as to this fact). Moreover, the RTC cites no authority for the proposition that a corporation must maintain insurance sufficient to cover any conceivable liability. *Cf. Reflectone, Inc. v. Farrand Optical Co.,* 862 F.2d 841, 845 (11th Cir.1989) (undercapitalization does not establish improper conduct where shareholder has no duty to supply funds to corporation). The possibility that a corporation's tort liabilities will exceed its assets is inherent in the concept of limited liability and is the principal if not sole attraction of the corporate form; veil piercing is not justified whenever this possibility materializes. "If this were the rule, it would completely destroy the corporate entity as a method of doing business and it would ignore the historical justification for the corporate enterprise system." *Dania*, 450 So.2d at 1120 (quoting *Advertects,* 84 So.2d at 24). *See also In re Silicone Gel Breast Implants Prods. Liability Litig.,* 837 F.Supp. 1128, 1137 (N.D.Ala.1993) ("such a definition of undercapitalization would result in limited liability for a corporation in the tort context only when it does not need it, *i.e.,* when the corporation's assets are sufficient to satisfy its liabilities").

In sum, given the strictness of *Dania* and its progeny and the lack of evidence of "improper conduct," it was reasonable for Latham to opine in 1988 that a veil piercing

claimant had only a "slight" chance of success under Florida law.

### (iii) *Misrepresentations About Pending Claims*

Third, the RTC alleges that Latham "falsely asserted that no alter ego or piercing-the-corporate-veil claims had been made against JWC" and that Latham knew in 1988 that a "massive frontal challenge" to the JWC/Celotex corporate veil was "virtually inevitable." (Am.Comp. ¶ 94(e)–(f)) In fact, Latham made no such assertion and had no duty to discuss future litigation. Latham explained that "we are informed by [JWC] that, to the best of its knowledge, no such claims have been asserted or threatened against [JWC]." (Opinion at 1) *Cf. Fortson v. Winstead, McGuire, Sechrest & Minick,* 961 F.2d 469, 475 (4th Cir.1992) (law firm properly relied upon accountants' representations as to financial disclosures for purposes of drafting opinion letter; law firm had no independent duty to verify); *Sable v. Southmark/Envicon Capital Corp.,* 819 F.Supp. 324, 335 (S.D.N.Y.1993) (law firm had no independent duty to verify representations of client accepted as assumptions for opinion letter). Latham expressly excluded from the scope of the Opinion the issue of "the likelihood of alter ego claims being asserted against [JWC]." (*Id.* at 2) Latham undertook only to analyze the legal merits of a hypothetical veil piercing claim, and not to survey pending or anticipated litigation.

### (iv) *Failure to Discuss Adverse FTC Authority*

▮ Fourth, the RTC claims that Latham fraudulently failed to consider the import of an FTC decision holding that Celotex was the "alter ego" of JWC. (Am.Compl. ¶ 94(g)) *See In re Jim Walter Corp.,* 90 F.T.C. 671 (1977), *vacated on other grounds,* 625 F.2d 676 (5th Cir.1980). But that decision had nothing to do with veil piercing or Florida law. In that case, the FTC challenged Celotex's acquisition of the Panacon Corporation, another producer of building supplies, under Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18 (1994). For purposes of assessing anticompetitive effects, the FTC held that the acquisition should be attributed to the parent JWC. The FTC expressly limited its holding to the field of antitrust enforcement and cautioned that "we do not imply that the separate incorporation of JWC and Celotex should be disregarded for all purposes." *Id.* at 737 n. 9. Thus, this ten year-old, later-vacated administrative decision had no bearing on the question Latham addressed in the Opinion.

### (v) *Failure to Discuss Adverse Florida Legal Authority*

Fifth, the RTC claims that Latham knowingly ignored the decision of a Florida intermediate appellate court in *Kelly v. American Precision Indus., Inc.,* 438 So.2d 29 (Fla. Dist.Ct.App.1983), *review denied,* 447 So.2d 885 (1984). (Am.Compl. ¶ 94(h)) In *Kelly,* the Court held that "[t]he act of a parent corporation in stripping a subsidiary corporation for the exclusive benefit of the parent gives rise to liability on the part of the parent...." *Id.* at 31. But this was an extreme case where a parent company sold off all the assets of the subsidiary and left the subsidiary as "a corporate shell with no assets, no employees, no property, and no active business operation." *Id.* at 29. The Court stated the common law requirements for veil piercing and summarily deemed them satisfied, but acknowledged that a finding of "fraud or wrong" was essential to the result. *Id.* at 31.

*Kelly* thus was a conclusory lower court decision, *see* Clark, *supra,* at 104 (noting lack of analysis in *Kelly*), antedating the decision of the Florida Supreme Court in *Dania.* Moreover, *Kelly* was consistent with *Dania,* which in any event is controlling and superior to *Kelly,* in requiring proof of intentional fraud. Accordingly, *Kelly* could not impugn Latham's assessment of a "slight" probability of an unfavorable outcome on the merits in a veil piercing suit.

### (vi) *Failure to Address Texas Law*

▮ Finally, the RTC charges that Latham

> intentionally omitted any reference to Texas law on piercing-the-corporate veil even though thousands of asbestos claims were

pending in Texas and, under that state's law, the likelihood of the Celotex corporate veil being pierced was substantial. (Am.Compl. ¶ 94(i)) The RTC asserts that Latham knew that Texas was "the most troublesome state" for JWC and that Texas courts would apply Texas law to veil piercing claims asserted there. (*Id.* ¶¶ 75–76)

The Opinion was "based solely upon and [was] limited to ... case law precedents in Florida," Opinion at 2, so it cannot be said that Latham falsely represented the content of Texas law. If there is fraud here, it is fraudulent omission.

Under Rule 10b–5, an omission may be fraudulent if the omitted information was necessary to make express assertions not misleading. Here, there is no dispute that Latham omitted a discussion of non-Florida law. But Latham took great care to make this omission not misleading. In fact, Latham flagged the issue by warning that "choice of law principles could result in the application of the laws of a state other than Florida." (Opinion at 3) Thus, Latham did not simply ignore a possible complication.

It is axiomatic that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988). In *Basic*, for example, the duty to disclose merger negotiations arose, if at all, from the general fiduciary responsibilities owed by directors of a corporation to shareholders. This relationship did not exist between Latham and the purchasers of the Hillsborough securities. Latham's duty to disclose arose instead from the firm's undertaking to opine on veil piercing law. *See, e.g., Kline v. First Western Govt. Secs., Inc.*, 24 F.3d 480, 490–91 (3d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *Ackerman v. Schwartz*, 947 F.2d 841, 848 (7th Cir.1991). The question, then, is whether Latham could render a non-misleading opinion on this subject without specifically mentioning the potential applicability of, and possible result under, Texas law.

In some cases, an omission of this sort would be fraudulent even if the author issued a carefully worded disclaimer. For example, suppose Latham were asked by a relatively unsophisticated client to opine on the validity of an ordinary contract. Assume Latham knows that the contract was signed in New York by two New Yorkers and is to be performed entirely in New York. If Latham issues an opinion discussing only Alaska contract law, this will be materially misleading under the circumstances even if Latham cautions that "choice of law principles could result in the application of the laws of a state other than [Alaska]." This hypothetical opinion would be useless, because it would include only obviously irrelevant material—Alaska law—and misleading, because it would ignore the law that obviously and exclusively governs the issue addressed—New York law.

Thus, a law firm cannot immunize itself from liability simply by issuing sweeping disclaimers that certain subjects are "beyond the scope" of an opinion letter. But this is just another way of saying that a law firm has the duty not to mislead, and that whether a statement is misleading depends on all the facts and circumstances. It does not mean that every time a law firm agrees to speak, it must speak encyclopedically. An opinion letter need not anticipate every contingency and express an opinion on every arguably relevant topic in order to be not misleading.

Here, it was reasonable to limit the Opinion to Florida law. KKR asked Latham to analyze a hypothetical veil piercing claim asserted against a Florida corporation headquartered in Florida (JWC), based on asbestos sold by a Delaware corporation headquartered in Florida (Celotex).

Courts in Florida, as in many American jurisdictions, look to the Restatement (Second) of Conflict of Laws for guidance on choice of law questions. In *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla.1980), the Florida Supreme Court adopted Section 145 of the Restatement, which generally directs the application in tort cases of the laws of the state with the "most significant relationship to the occurrence and the parties." Florida courts also have looked to other provisions in the Restatement for

choice of law analysis. *See, e.g., International Ins. Co. v. Johns,* 874 F.2d 1447, 1458 n. 19 (11th Cir.1989) (applying Section 309, which provides that the law of the state of incorporation governs the liability of officers and directors to shareholders); *Continental Mortgage Investors v. Sailboat Key, Inc.,* 395 So.2d 507, 511 (Fla.1981) (applying Section 203).

Section 307 of the Restatement states the general norm that

> The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts.

Restatement (Second) of Conflict of Laws § 307 (1971). *See also* Janet C. Alexander, *Unlimited Shareholder Liability Through a Procedural Lens,* 106 Harv.L.Rev. 387, 410 (1992) ("The well-settled choice of law rule is that the rights and obligations of shareholders with respect to the corporation, including their liability for corporate obligations, are governed by the law of the state of incorporation"). This rule suggests that Delaware law—which is similar to Florida law on this point—would apply in a suit to pierce the corporate veil of Celotex. *See, e.g., In re Phillips Petroleum Secs. Litig.,* 738 F.Supp. 825, 838 (D.Del.1990) ("courts of Delaware do not easily pierce the corporate veil"); Gresser § 2.08 ("until recently it was clear that it was comparatively difficult to pierce the veil in Delaware, and, while it may be becoming somewhat easier, it is still probable that corporate veils will not be pierced unless '[f]raud or something like it' is present") (citation omitted). *See also In re Hillsborough,* 166 B.R. at 468.

Of course, if a suit were filed by plaintiffs in another state, different choice-of-law principles would apply and might compel the application of the law of a state other than Delaware or Florida. Celotex maintained operations in several states and sold its products nationwide. By the 1980's, significant asbestos litigation was pending in many jurisdictions across the country. It thus was conceivable that JWC also might face suits in any of the 49 other states. *See generally* G.

Michael Epperson & Joan M. Canny, *The Capital Shareholder's Ultimate Calamity,* 37 Cath.U.L.Rev. 605, 640 (1988) ("investors and their counsel are best served by a working assumption that their corporate veil may be judged by the standards of any jurisdiction in which personal jurisdiction may properly be asserted over the corporation and its shareholders").

Given this uncertainty, one could guarantee that an opinion letter on veil piercing would not be misleading in one of two ways. First, one could analyze and opine on the veil piercing law of all 50 states. Alternatively, one could focus on the jurisdiction or jurisdictions whose law seemed most likely to apply, and then explain that choice of law rules raise the possibility that a court might apply the laws of another jurisdiction. Latham did the latter.

It is important to remember that Latham was addressing a hypothetical veil piercing suit as hypothesized in 1988. The RTC's insistence that it was essential to discuss Texas law derives largely from an appreciation of the significance of the *Larned* action. *Larned,* of course, was filed over a year after Latham issued the Opinion, and thus was not part of the legal landscape when Latham prepared the Opinion.

Latham did not undertake to write a treatise on veil piercing law or choice of law, and I hesitate to read the federal securities laws to require the authors of opinion letters to conduct 50–state surveys whenever a legal issue potentially implicates multiple jurisdictions. Given the specificity of Latham's disclaimers and the sophistication of the large institutional investors that allegedly relied on the Opinion, Latham's decision to limit its analysis to Florida law was not misleading. *Cf. Fortson,* 961 F.2d at 475 ("To find a duty in the face of this express disclaimer ... would render law firms powerless to define the scope of their involvement in commercial transactions").

Concededly, Texas is "somewhat more lenient than other jurisdictions in disregarding the corporate entity." *See* Gresser § 2.45 (citation omitted) (describing Texas veil piercing law as "perplexing and confused").

*See also Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex.1986); Robert F. Gray and Gregory J. Sergesketter, *Annual Survey of Texas Law, Part I: Private Law—Corporations*, 44 Sw.L.J. 225, 238 (1990). But this does not mean that Texas courts apply Texas veil piercing law to any suit filed in that state. Like Florida courts, Texas courts look to the Restatement on choice of law issues. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979) (overruling common law doctrine of *lex loci delicti;* adopting Section 145 of the Restatement for choice of law analysis in tort cases). Moreover, Texas has codified the Restatement rule that

> only the laws[4] of the jurisdiction of incorporation of a foreign corporation shall govern ... the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement.

Tex.Bus.Corp.Act Ann. art 8.02 (West Supp. 1994); *see also Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203–04 (5th Cir.1995) (affirming application of Delaware law to determine alter ego liability of Delaware corporation based on tort claims arising in Texas). Thus, Texas courts, including the Court in *Larned,* would have been required under Texas law to apply Delaware law to veil piercing claims against Celotex. *Cf. Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1161 (5th Cir.1983) ("The Lone Star of Texas may shine brightly throughout the world, but its long arm is not judicially all encompassing").

The RTC cites two cases for the proposition that "Texas routinely applies its *own* law in veil-piercing tort cases involving non-Texas corporations." *See* Pl.Mem. at 20 n. 18 (emphasis in original) (citing *Miles v. American Tel. & Tel. Co.*, 703 F.2d 193, 194–95 (5th Cir.1983) and *Moffett v. Goodyear Tire &*

*Rubber Co.*, 652 S.W.2d 609, 613 (Tex.App. 1983)). But neither of these courts addressed the issue of choice of law, and apparently the litigants in these cases did not direct the courts' attention to Tex.Bus.Corp. Act.Ann. art. 8.02.

Thus, I find (1) that Latham had no duty to opine on Texas law, (2) that Latham's failure to address the law of jurisdictions other than Florida was not misleading in view of the explicit choice of law disclaimer in the Opinion, and (3) that Texas law was immaterial because Texas choice of law rules would have prevented the application of Texas substantive law in a veil piercing suit against JWC filed in Texas.

### C.

■ The preceding analysis suggests that not only Latham, but any able corporate lawyer, knew or could have figured out in 1988 that future veil piercing suits against JWC were unlikely to succeed on the merits. If so, one might expect that the securities market would have been unfazed by an event such as the filing of the *Larned* action, because in efficient capital markets, the prices of securities reflect available public information. *See* Ronald L. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 U.Va.L.Rev. 549, 551 (1984). Thus, it might seem difficult to explain why the filing of *Larned* had such a devastating impact on the price of Hillsborough securities when the probability of an outcome unfavorable to JWC was "slight."

In fact, this phenomenon is not difficult to explain. The securities market rationally could devalue Hillsborough securities even if there was only "slight" legal merit in suits such as *Larned* for at least two reasons.

---

4. It is not clear whether this usage of the term "laws" was intended to embrace choice of law principles in addition to other substantive law. A statute such as this might be read to require the application of the foreign jurisdiction's, *i.e.* Delaware's, choice of law principles, which might conceivably direct the application of the laws of Texas as the place where the injury occurred. If, under Delaware choice of law principles, the "laws of Texas" includes Texas choice of law principles, this might lead to infinite regress. *See generally* Larry Kramer, *Return of the Renvoi*, 66 N.Y.U.L.Rev. 979 (1991).

In any event, the issue is of only theoretical interest because I do not interpret Article 8.02 as requiring the application of the foreign jurisdiction's choice of law principles, and because Delaware also looks to the Restatement for choice of law analysis in tort cases. *See Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46–47 (Del.1991) (Section 145); *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del.1987) (Section 302).

First, even if any veil piercing lawsuit would be meritless, Hillsborough faced the prospect of bad publicity, a long struggle, and substantial legal expenses. Latham, in fact, offered a muted warning to this effect in the Opinion when it disavowed a prediction as to JWC's ability to prevail in a veil piercing suit at the summary judgment stage.

Second, as a matter of mathematical analysis, the expected liability attributable to possible veil piercing suits could have been substantial even though the probability that the defendants would lose on the merits was small. Expected liability equals the product of the probability that liability will be imposed multiplied by the magnitude of liability in the event it materializes. Latham correctly assigned a low value to the probability of liability. But the potential liability in the event of an adverse judgment on veil piercing nonetheless was tremendous because of the amount of asbestos Celotex had distributed, and the resulting magnitude of Celotex's unsatisfied asbestos liability.

\* \* \* \* \* \*

A case arising out of a bond offering, *Mirotznick v. Sensney, Davis & McCormick*, 658 F.Supp. 932 (W.D.Wash.1986), illuminates the issues at hand. In *Mirotznick*, a law firm issued an opinion to the effect that numerous municipalities participating in the offering had authority to do so. The municipalities later unsuccessfully sought a judicial declaration that they lacked such authority. When bond prices fell, the bond purchasers sued for fraud. The Court dismissed the claims, explaining as follows:

> That there is, as a matter of law, an insufficient nexus between defendant's opinion letters and plaintiffs' claimed damage is well illustrated by class plaintiffs' efforts to impose liability against those attorneys who *correctly* opined that their clients had authority. The argued basis for this liability is that these defendants should have foreseen an unsuccessful attack on the Participants' authority. To so hold would

impose 10b–5 liability for breach of an implied guarantee against baseless or unsuccessful litigation.

*Id.* at 940–41 (emphasis in original). I similarly decline to hold Latham to such a duty. Because the RTC can prove neither affirmative fraud nor a materially misleading omission, defendants are entitled to summary judgment on the claim under Rule 10b–5.

Defendants also have argued that the losses suffered by the RTC were caused by "external, independent events"—including the filing of the *Larned* action, the general collapse of the "junk" bond market in 1989, and the Hillsborough bankruptcy proceedings—and that therefore the RTC cannot establish that its losses were caused by the alleged fraud. *See* Def.Mem. at 35. Because I find that the Opinion was not false or misleading, it is not necessary to reach the issue of loss causation.

### IV.

The RTC also has asserted fraud claims under New York common law and Cal.Civ. Code. §§ 1709–1710 (West 1994). Both parties agree that "there is no material difference for purposes of this motion between the law governing federal securities fraud claims and New York common law fraud claims." (Pl.Mem. at 46 n. 41; Def.Mem. at 66–68) It is not clear why California law would be applicable in this case, but California's statutory requirements for fraud under Sections 1709[5] and 1710[6] also are substantially similar to the standards applied under Rule 10b–5. *See, e.g., Koehler v. Pulvers,* 614 F.Supp. 829, 847–48 (S.D.Cal.1985); *Williams v. Wraxall,* 33 Cal.App.4th 120, 39 Cal.Rptr.2d 658, 664 (1995). Accordingly, for the reasons explained above in Part III of this opinion, defendants are entitled to summary judgment on these claims as well.

### V.

■ The initial complaint in No. 93 Civ. 4364 included claims brought by the RTC as

---

**5.** Section 1709 provides that "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

**6.** Section 1710 defines deceit as "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact...."

receiver of FarWest Savings & Loan Association ("FarWest") and Columbia Savings & Loan Association ("Columbia") based on purchases of Hillsborough securities by American Capital Fidelity Corporation ("ACFC") and Liberty Service Corporation ("Liberty"), two wholly owned, but non-conserved subsidiaries of FarWest and Columbia, respectively. In my ruling from the bench on December 2, 1993, I dismissed these claims because the RTC does not have standing to assert a cause of action accruing in favor of a non-conserved subsidiary. *See In re Frost Bros., Inc.*, No. 91 Civ. 5244 (PNL), 1992 WL 373488, *3–*4 (S.D.N.Y. Dec. 2, 1992) (under California law, FarWest does not have standing to assert claims on behalf of ACFC).

On January 14, 1994, to remedy the standing defect, ACFC and Liberty assigned any claims arising out of their 1988 purchases of Hillsborough securities to the RTC. On March 3, 1994, the RTC filed the second of the above-captioned cases, 94 Civ. 1460, as assignee of ACFC and Liberty. Because these claims are substantively identical to the claims asserted by the RTC as receiver in 93 Civ. 4364, they are dismissed for the reasons stated above in Part III of this opinion. Accordingly, it is not necessary to revisit the statute of limitations issue addressed briefly in the December 2, 1993 bench ruling and discussed at length in the parties' memoranda of law.

\*      \*      \*      \*      \*      \*

For all the foregoing reasons, the motion for summary judgment is granted in both of the above-captioned cases, and the complaints are dismissed.